STATE *vs.* HORACE P. BECK.

NEWPORT—MAY 8, 1899.

PRESENT : Matteson, C. J., Stiness and Tillinghast, JJ.

(1) *Construction of Statutes.*

Statutes must be construed with reference to the whole system of which they form a part, and statutes upon cognate subjects may be referred to,

although not strictly *in pari materia.* A penal statute must be strictly construed, and the act constituting the offence must be within both the letter and spirit of the statute. In the construction of such statutes it may be the duty of the court, in giving effect to the manifest intention of the legislature, to restrain, enlarge, or qualify the ordinary and literal meaning of the language used, and if there is a reasonable doubt as to whether the acts done are within the meaning of the statute, the person accused of the violation is entitled to the benefit of the doubt.

(2) *Practice of Dentistry. Rights of Physicians and Surgeons.*

By virtue of the broad and general language used in Gen. Laws R. I. cap. 165, relating to the authority to practice medicine and surgery, physicians and surgeons qualified under the provisions of said chapter are excepted from the restrictions imposed on other persons regarding the practice of dentistry by Gen. Laws R. I. cap. 155, and the amendments thereto.

INDICTMENT charging defendant with practicing dentistry in violation of statute. Heard on demurrer to indictment. Demurrer sustained and indictment quashed.

TILLINGHAST, J. The indictment charges, in substance, that the defendant did unlawfully practice dentistry in Newport on the first day of August, 1898, without first having obtained a certificate from the Board of Registration in Dentistry, and without first having caused his name and place of business to be registered with said board.

The defendant has filed a special plea in bar to said indictment, in which he sets up, in brief, that at the time aforesaid he held a certificate in due form from the State Board of Health ; that he was qualified to practice medicine and surgery by reason of the possession by him of a diploma from a reputable and legally chartered college, endorsed by said Board of Health, by virtue of which he was qualified to practice medicine and surgery in all its branches upon all parts of the human body, including the teeth.

To this plea the attorney-general has demurred, on the ground that a certificate from the State Board of Health authorizing the defendant to practice medicine and surgery, as provided in Gen. Laws R. I. cap. 165, does not authorize him to practice dentistry without having first obtained a certificate from the Board of Registration in Dentistry and

otherwise qualifying himself to practice dentistry in accordance with the provisions of Gen. Laws R. I. cap. 155, as amended by Pub. Laws R. I. cap. 470.

The question presented for our decision under the pleadings, therefore, is whether the defendant had the right, by virtue of his authority to practice medicine and surgery, to practice dentistry. The answer to this question depends upon the construction to be given to the statute regulating the practice of dentistry, taken in connection with that regulating the practice of medicine; as, independent of these statutes, there can be no doubt of the right of the defendant to practice dentistry.

The first law regulating the practice of dentistry in this State was passed on June first, 1888. (See Pub. Laws R. I. cap. 712.) At that time there was no law regulating the practice of medicine. Section 4 of Gen. Laws R. I. cap. 155, as amended by Pub. Laws R. I. cap. 470, § 1, passed May 21, 1897, which is the same in effect as section 4 of the original act, provides that "All persons who hereafter intend to enter the practice of dentistry in this state, shall appear before said board and be examined with reference to their knowledge and skill in dentistry; and to such as pass a satisfactory examination, certificates to that effect, signed by the president and secretary of the board, shall be issued; and thereupon the names of such persons receiving certificates as aforesaid shall be registered with said board."

Section 6, as amended by Pub. Laws R. I. cap. 470, § 3, prescribes a penalty for practicing or attempting to practice dentistry in violation of the provisions of the act. On May 16, 1895, the General Assembly passed an act regulating the practice of medicine (see Pub. Laws R. I. cap. 1353), said act now constituting Gen. Laws R. I. cap. 165. This act makes it unlawful for any person to practice medicine or surgery in any of its branches without first exhibiting and registering under oath, in the town or city clerk's office in the town or city where he resides, his authority for so practicing medicine, as prescribed in the act, together with his age, address, place of birth, and the school of medicine to which he pro-

poses to belong.   The authority to practice medicine and sur-
gery under said act is a certificate from the State Board of
Health.

The evident purpose of the General Assembly, in the pas-
sage of the act relating to the practice of dentistry, was to
protect the public from being imposed upon by persons who,
while holding themselves out as competent to extract, clean,
or repair teeth, or replace them by artificial ones, yet from
want of instruction and skill in the art were wholly unfit to
perform such a delicate and highly important function.   See
State v. Mylod, 20 R. I. 632, on p. 637, as to the object of
said chapter 165.   It is a matter of common knowledge that
before the passage of said act the merest novice in the art was
frequently employed to extract and operate upon the teeth,
to the unnecessary discomfort, and sometimes to the perma-
nent injury, of his patient.   These persons were not physi-
cians, and, as a rule, had little or no scientific knowledge
of the human body; and the only knowledge which they
possessed of the art of dentistry was that which they had ac-
quired by a meagre and haphazard practice.   Such knowl-
edge, while it might have been considered sufficient in the
days of our grandfathers, is wholly inadequate for present
demands; for while dentistry, as an independent vocation,
may have had an humble and comparatively recent origin,
yet it has now become a very important branch of medical
science.   See Rehfuss' Dental Jurisprudence, 34, 42.   As said
by Brace, J., in State v. Fisher, 119 Mo. 356 : "The fact
that this branch of the medical profession has grown to such
proportions as to have its own independent colleges and to
confer its own degrees, and that it has become necessary that
its practice should be regulated by statute, indicates the im-
portance of the exercise of its functions to the public wel-
fare."   See Rehfuss' Dental Jurisprudence, title "History of
Dental Legislation," 205.

From what we have thus said, it would seem clear that the
reason for the passage of said chapter 155 and the amend-
ments thereto does not apply to the practice of dentistry by
regular physicians.   A physician is one who practices the

art of healing disease and preserving health ; a prescriber of remedies for sickness and disease. See Century Dictionary, Vol. 4. He is presumed to be familiar with the anatomy of the human body in its entirety ; to understand the science of physiology and the laws of hygiene, and to be able to minister, as far as may be, to the relief of pain, disease, and physical ailments of all sorts and kinds whatsoever. And while it is true that many physicians devote themselves entirely to some branch of the medical profession for which they have made special preparations, yet the fact that they have first qualified themselves generally for the practice of medicine and surgery in all its branches, and obtained a license to pursue such practice, must be held to entitle them to operate upon the teeth and jaw, as well as upon other parts of the human organism, unless the statute now under consideration (1) clearly prohibits them. By the strict terms of said statute, taken by itself, it doubtless does prohibit physicians, as well as all other persons, from practicing dentistry without first obtaining the required certificate, as the inhibition is general and no exception is made in favor of physicians. Said statute, however, should not, in our judgment, be taken by itself, but should be construed in connection with said chapter 165, which, while perhaps not strictly *in pari materia*, yet deals with the general subject of the practice of medicine and surgery and prescribes the qualifications requisite therefor.

A familiar rule in the construction of statutes is that a statute must be construed with reference to the whole system of which it forms a part, and that statutes upon cognate subjects may be referred to, though not strictly *in pari materia*. Sutherland on Stat. Construc. 284. Another rule is that a penal statute must be strictly construed, and that the act constituting the offence must be within both the letter and the spirit of the statute. *Lair* v. *Killmer*, 25 N. J. L. 522 ; *Telegraph Co.* v. *Axtell*, 69 Ind. 199. And in the construction of such statutes it sometimes becomes the duty of courts, in giving effect to the manifest intention of the legislature, to restrain, enlarge, or qualify the ordinary and literal meaning of the language used. *Noble* v. *State*, 1 Iowa, 325.

Now by the express terms of said chapter 165, a person holding a certificate, in accordance with the provisions thereof, is authorized to practice medicine and surgery in all its branches. Dentistry is now a well-recognized branch of surgery. A dentist is a dental surgeon. He performs surgical operations upon the teeth and jaw, and, as incidental thereto, upon the flesh connected therewith. His sphere of operations then, as before intimated, is included in the larger one of the physician and surgeon. A fair and reasonable construction of the two statutes taken together, therefore, comes to (2) this: That the General Assembly, by the use of the broad and general language used in said chapter 165 relating to the authority to practice medicine and surgery, must be held to have intended to except physicians and surgeons from the restrictions imposed upon other persons, regarding the practice of dentistry, by said chapter 155 and the amendments thereto. This view is strengthened by the fact, which is common knowledge, that it has always been the custom in this State, and probably everywhere else, for physicians to treat ailing teeth, to extract teeth, and to perform various other professional services which technically come within the purview of dentistry. Physicians who reside in the country towns especially have always been called upon, to a greater or less extent, for the performance of such services. And to now prohibit them from thus treating their patients would be a source of great inconvenience and in many cases of extreme hardship and suffering to the latter, as well as an interference with the proper and legitimate functions of the former. And, as said by defendant's counsel, "any construction of the law that prevents the general practitioner from treating any part of the human body, or restricts him in the discharge of his professional duties, would be a menace to the public health and would deprive the physician of the right to practice a branch of his profession that is as old as the history of medicine itself."

In defining the term "medicine," in the case of *In re Petition of the Medico-Chirurgical College of Philadelphia*, decided February 27, 1899, Judge Dean says: "We take the

word 'medicine' in this common signification, which in the beginning, and yet, with most of us, includes all learning having for its object the care of the health and the cure of the ills of the human body. Even within the recollection of some of us, the practicing physician or family doctor kept in his own office his drugs, compounded them himself, and, not seldom, maintained a dental chair wherein he seated his patients and dosed or extracted their ailing teeth. He had not only been taught dental surgery and pharmacy, but practiced both under his degree from a college of medicine."

By the express exemption of physicians and surgeons from the operation of similar laws in several other States, the principle that dentistry is a branch of medical science has been recognized, as is shown in the following instances:

Section 1, Connecticut law, approved April 4, 1887, provides that "nothing in this act shall interfere with physicians in the discharge of their professional duties."

Section 7, Louisiana law, approved March 10, 1880, provides that "nothing in this act shall apply to regular physicians and surgeons."

Section 8, Maine law, approved March 4, 1891, provides that "nothing in this act shall be so construed as to restrict or interfere with physicians and surgeons in the discharge of their professional duties."

Section 8, Maryland act, approved April, 7, 1886, provides that "nothing shall be so construed as to interfere with the rights and privileges of resident physicians and surgeons in the discharge of their professional duties."

Section 12, Michigan act of September 9, 1883, provides that "nothing in this act shall be construed so as to interfere with physicians and surgeons in their practices as such."

Section 1, Mississippi act, approved February 25, 1882, provides that "the provisions of this act shall not apply to any person holding the diploma of Doctor of Medicine from any reputable medical college."

Section 3, New Hampshire law, provides that "it shall not be lawful for any person, who is not duly authorized to practice medicine or surgery, to practice dentistry, unless," &c.

Section 1, North Carolina law, provides that "it shall be unlawful for any person excepting regularly authorized physicians and surgeons to commence the practice of dentistry, unless," &c.

And, as well stated in the brief of defendant's counsel, in connection with the above citations, "the fact that in so many instances the physicians and surgeons are expressly exempt from the provisions of the dental laws shows that from the beginning they have been recognized as competent to practice dentistry, and that it is a part of their professional duties; and no doubt the provision exempting them was incorporated for the sole purpose of giving expression in the law to what is a recognized fact and to foil any attempt to prevent them from practicing all branches of their profession through any narrow interpretation of the law."

In *State* v. *Vandersluis*, 42 Minn. 129, the court, in speaking of a similar law, says: "The act before us could hardly be so construed as to limit the right of the surgeon under his license."

Again, it is to be borne in mind that the statutes under consideration are highly penal in their nature. And it is a familiar rule that, in the construction of such statutes, if there is a reasonable doubt as to whether the acts done are within the meaning of the statute, the person accused of the violation thereof is entitled to the benefit of that doubt. Endlich on Int. of Stat. §§ 329–30; *State* v. *Mylod, supra*, at p. 637; *Commonwealth* v. *Standard Oil Co.*, 101 Pa. St. p. 150; *Schooner Enterprise*, 1 Paine Cir. Ct. Rep. 32; *Hines & Battle* v. *Railway Co.*, 95 N. C. 434; *State* v. *Drowne*, 20 R. I. 302, on p. 306.

For the reasons above given, we are of opinion that it was not the intention of the General Assembly, in the passage of said chapter 155 and the amendments thereto, to preclude physicians and surgeons from practicing dentistry; or, at any rate, that there is a reasonable doubt whether they were intended to be thus precluded; and hence the demurrer must be overruled and the plea sustained.

Demurrer overruled, plea in bar sustained, and indictment quashed.

·*Charles F. Stearns, Assistant Attorney-General*, for State.

*Frank F. Nolan*, for defendant.

---

ALONZO J. NICKERSON, Exr., *vs.* ALEXANDER E. BRAGG *et al.*

PROVIDENCE—MAY 11, 1899.

PRESENT : Matteson, C. J., Stiness and Rogers, JJ.

(1) *Pecuniary Legacies. Abatement.*

A will bequeathed a sum of money to two parties, with the provision that the income thereof should go to another during life:—

*Held*, that the bequest was not strictly an annuity, but the temporary · income of a pecuniary legacy.

*Held*, further, that a mere diversion of income for a time cannot change the character of a pecuniary legacy.

*Held*, further, there being nothing in the will to show an intention to give the sum without abatement, the bequest must abate with other general pecuniary legacies.

*Semble*, when there is a deficiency of assets, annuities must abate ratably with pecuniary legacies, if there is nothing in the will to show a contrary intention.    Citing *Richardson* v. *Bowen*, 18 R. I. 138.

(2) *Lapsed Bequests.*

A lapsed legacy, unless specifically bequeathed by the will, falls into the residue of the estate without provision therefor contained in the will.

(3) *Bequest of Residue.*

The gift of a residue is subject to the precedent claims of the estate. Upon deficiency of assets the amount thereof will go to the fund for the general pecuniary legacies.

BILL IN EQUITY for instructions.    Heard on bill.

STINESS, J.    The will in question gives pecuniary legacies to the amount of $7,700.    The funds in the hands of the executor are not enough to pay them in full, and the executor asks for instructions.

The fourth clause of the will gives to Dorcas H. Thayer "the interest of $1,000, to be paid to her semi-annually, or

oftener, during the term of her natural life; and at her decease $500 of the above-named $1,000 shall be paid to the Treasurer of the American Bible Society with which the Methodist Episcopal Church is connected, and the remaining $500 shall be paid to the treasurer of the New England Southern Conference Missionary Society, auxiliary to the Missionary Society of the Methodist Episcopal Church, incorporated by the legislature of the state of New York, for the use of said society."

Two legacies, of $100 each, are given by the seventh clause to persons who died before the testatrix, and the clause provides: "If any of the persons named above in this seventh item be not living at the time of the settlement of my estate, then the share of that person or persons shall be placed with the remainder of my estate."

The questions are:

First. Whether the legacy to Mrs. Thayer must abate *pro rata* with the other legacies, or whether the sum of $1,000 shall be set aside for her, regardless of the other legatees?

Second. Whether the other legacies specified in said will shall abate *pro rata?*

Third. What shall be done with the legacy bequeathed to Mrs. Mary Cobb, who died before the testatrix?

(1) As to the first question, the general rule was stated in *Richardson* v. *Bowen*, 18 R. I. 138, that, when there is a deficiency of assets, annuities must abate ratably with pecuniary legacies, if there is nothing in the will to show a contrary intent. The bequest in this case is not strictly an annuity, but the temporary income of a pecuniary legacy. The gift of a sum of money is made to two parties, with the provision that its income shall go to another during life. If the gift stood alone, there can be no question that it would abate; and the mere diversion of income for a time cannot change the character of the legacy. Hence, under the rules of both annuities and general pecuniary legacies, it must abate *pro rata* with other legacies. 1 Am. & Eng. Ency. L. (2d ed.) p. 45. So it is suggested that, by reason of her ad-

vanced age and inability to provide for her own support, the bequest may be similar to that in *Richardson* v. *Bowen*, *supra*, where it was held that the payment of the stated sum should not abate. But in that case the intention to give the sum without abatement, presumably for the reason stated, appeared in the will itself. Nothing appears in this will to raise such a presumption.

Second. As we see nothing in the will to evince an intention to prefer any of the pecuniary legacies, all are subject to abatement under the rule above stated.

(2) Third. The seventh clause adds lapsed legacies to the residue, but the result would be the same without this provision in the will. *Peckham* v. *Newton*, 15 R. I. 321. We see no reason to infer that these legacies were to be taken out of the general rule and made specific gifts to the remain-

(3) der-men. The gift of a residue is subject to the precedent claims upon the estate. It is a gift of what remains after the debts and legacies are paid. *Tomlinson* v. *Bury*, 145 Mass. 346, 347; *Derby* v. *Derby*, 4 R. I. 414. The amount, therefore, of the lapsed legacies will go to the fund for the general pecuniary legatees.

*John A. Tillinghast*, for complainant.

*Weed & Weed*, for respondents.

---

POPE MANUFACTURING CO. *vs.* D. L. D. GRANGER, City Treasurer.

PROVIDENCE—MAY 13, 1899.

PRESENT: Matteson, C. J., Stiness and Tillinghast, JJ.

(1) *Municipal Contracts. Principal and Agent.*

While the city council of the city of Providence has the entire control of the moneys belonging to the city, under the provisions of the charter of said city, and no committee, either of the council or of either branch thereof, has any authority, except as authorized by vote or ordinance thereof, to incur any liability or expend any money, yet, after an appropriation has been made by the city council for a certain department, that branch of the city council or that committee thereof having charge

of such department may lawfully incur debts and audit bills to be paid out of the appropriations therefor; and this right is recognized by chapter 14 of the ordinances of 1887, page 406, so long as the amount of debts contracted is within the limit of the appropriation.

(2) *Power of Committee to Bind City.*

The committee of the board of aldermen on the health department of the city of Providence voted that the superintendent of health be authorized to purchase a bicycle for use in said department:—

*Held,* there being money subject to the control of the board of health sufficient to pay the bill at the time of contracting the debt, that, unless it appeared clearly that such an act was beyond their jurisdiction, or a palpable abuse of their discretion, it was binding upon the city and could not be questioned in a court of law.

*Held,* further, a subsequent ratification of the purchase by the committee, by the board of aldermen was equivalent to a resolution authorizing the purchase of the same in the first instance.

ASSUMPSIT. Heard on agreed statement of facts. Case remitted to District Court to enter judgment for plaintiff.

TILLINGHAST, J. This is an action of assumpsit to recover the sum of $50 for a bicycle. The agreed statement of facts shows that at a meeting of the committee of the board of aldermen on the health department, held September 27, 1897, it was voted that the superintendent of health be authorized to purchase a buggy with rubber tires, at a cost not to exceed two hundred dollars, and a bicycle not to exceed fifty dollars; that on the same day the superintendent of health purchased of the plaintiff a bicycle for fifty dollars, which was on the same day delivered to Walter J. Lewis, inspector of nuisances of the health department; that on September 30th of the same year, at a meeting of said committee, the schedule of bills for the month of September, containing the bill of the plaintiff for fifty dollars, was examined and approved; that on October 7th of the same year, at a full meeting of the committee on the health department, a communication from the city auditor relative to the bill of the plaintiff for said bicycle was read, and that after a free discussion it was voted that the committee see no sufficient reason for rescinding their resolution of September 27th, authorizing the purchasing of a bicycle at a cost not to exceed fifty dollars, and

voted that the city auditor be requested to audit the bill of the plaintiff, which was returned with his communication of October 2d for further consideration; that on October 14, 1897, the city auditor presented to the joint standing committee on accounts of the city council, without his approval, the aforesaid bill of the plaintiff, sent to him with the approval of the superintendent of health, the committee on health, and the board of aldermen; that the auditor's reason for not approving the bill was that the city council had not authorized the use and purchase of bicycles, and that such authority of the city council should first be obtained. Said joint standing committee afterwards voted to refer the bill to the city council, which was done, and after some discussion by that body it was indefinitely postponed. It further appears that at the time the bill in question was contracted there was an unexpended balance of an appropriation made by the city council for the health department, sufficient in amount to pay said bill.

In view of these facts, the question presented for our decision is whether the defendant is liable on said contract.

(1)    The defendant contends that the city council alone has the right to expend the money of the city and to provide how it should be expended. He relies for this position upon clause 13, page 8 of the city charter—Ordinances of Providence, Revision of 1887—which provides that "The city council shall take care that money shall not be paid from the treasury unless granted or appropriated." His contention in this regard is doubtless correct. The city council has the entire control of the moneys belonging to the city, and no committee of the council or of either branch thereof has any authority, except as authorized by vote or ordinance thereof, to incur any liability or expend any money. But while this is so, we understand that after an appropriation has been made by the city council for a certain department, such, for instance, as the poor department, or the health department, that branch of the city council or that committee thereof having charge of such department may lawfully incur debts and audit bills to be paid out of the appropriation therefor. Chapter 14 of

the ordinances of 1887 (see page 406 *et seq.*) clearly recognizes the right of the various departments and committees thus to contract debts so long as they keep within the limit of the appropriations made.    Section 2 reads as follows : "In every financial year the specific appropriations for the several objects enumerated in the ordinance making appropriations for such year shall be deemed to be the entire amount to be expended during such financial year by the several committees having charge of the respective appropriations ; and after the passage of such ordinance no expenditures shall be authorized for any object unless there be sufficient money in the treasury, unappropriated, to meet such expenditures, or unless provision for the payment thereof shall be made by transfer from some of the appropriations already made, or by directing the city treasurer to borrow the money required therefor."

(2)    The board of aldermen is *ex officio* the board of health for said city.    Gen. Laws R. I. cap. 40, § 13.    As a board of health they have sole charge of all matters within their jurisdiction, and when an appropriation has been made to enable them to discharge their duties, we fail to see any reason why they may not lawfully contract bills, in their discretion, to be paid out of such appropriation.    They are sworn officials of the city ; they constitute an important branch of the city government and are charged by law with the discharge of very important duties, especially when acting as a board of health, and it is certainly to be presumed that they will intelligently and faithfully perform such duties ; and unless it clearly appears that a given act, like the one in question, is either beyond their jurisdiction or is a palpable abuse of their discretion, it is binding upon the city and cannot be questioned in a court of law.    In the case at bar the purchase was made by authority of a committee of the board of health ; the bill was approved by said committee, by the superintendent of health, and also by the board itself ; and there was money subject to the control of said board sufficient to pay the bill.

It is true, as said by defendant's counsel in his brief, that there was no resolution of the board declaring that a bicycle

was necessary and directing its purchase, as he says was the custom in other cases.    But the subsequent ratification of the purchase by the board was equivalent to a resolution authorizing the same.    In short, the purchase was in effect the act of the board as fully as if it had been made in pursuance of a resolution to that effect.

As to the auditor's reason for not approving the bill, viz., that the city council had not authorized the purchase and use of bicycles and that such authority should be first obtained, we reply, that while ordinarily it is doubtless better for any committee or department of the city government to obtain special authority for the purchase of any materials which are of an entirely different character from those previously or usually called for or considered necessary in prosecuting the work of such department, yet we cannot say as a matter of law that it was necessary that such authority should have been obtained in this case.    We think the bill in question was lawfully contracted, and that the plaintiff is entitled to judgment for the amount claimed with costs.

Case remitted to the District Court of the Sixth Judicial District, with direction to enter judgment for the plaintiff for the amount claimed and costs.

*Alfred S. Johnson*, for plaintiff.

*William B. Greenough*, for defendant.

---

THEODORE W. PHILLIPS *vs*. PROVIDENCE STEAM ENGINE CO.

PROVIDENCE—MAY 14, 1899.

PRESENT: Matteson, C. J., Stiness and Tillinghast, JJ.

(1)  *Corporations.    Dissolution.  Power of Majority of Stockholders to sell Property.*

When a corporation is no longer able to profitably continue its business, it has the power to sell its entire property by a majority vote of the stockholders, if such action on the part of the majority is free from unfairness, oppression, or fraud as to the minority of the stockholders.

(2)  *Right of Minority Stockholder.*

In a suit by a minority stockholder to restrain the sale by the majority, on

the ground of inadequacy of the price, and praying that a receiver might be appointed and the property sold by auction upon a dissolution of the corporation; in the absence of any proof that a larger price could reasonably be expected by an auction, or that any one is willing to bid as much as the price arranged for the sale, or that the complainant stands ready to bid or knows any one who would bid upon the property at such sale, no oppression or fraud by the majority being alleged, equity will not interfere to disturb the agreement.

(3)  *Adequacy of Price.*

The fact that the sale was approved by the stockholders by a vote of 3,675 shares against 75 tends to show the fairness of the price.
*Wilson* v. *Prop'rs Central Bridge,* 9 R. I. 590, distinguished.

BILL IN EQUITY to restrain a sale of the property of a corporation, ordered by a vote of the majority of the stockholders, brought by a minority stockholder. The facts are stated in the opinion. Heard on bill, answer, and replication. Bill dismissed.

STINESS, J. The complainant, a stockholder, seeks to restrain the respondent corporation from disposing of its property. The company is doing business under an extension by its creditors, in the terms of which an installment becomes due in November next. It is agreed that this cannot be met, and that the company will be unable to go on in business because the creditors refuse a further extension. In view of these facts, an arrangement has been made to form a new company, in which creditors holding extension notes will take preferred stock to the extent of one-half of their claims, while other subscribers will furnish enough cash to pay for the plant and provide a working capital. The terms of the proposed sale give to the present stockholders $70,000 over and above the indebtedness of the company, amounting to about $228,000, making a total payment of about $298,-000. The estimates of the value of the property vary from $327,000 to $397,000, the latter being the complainant's estimate; but it does not appear that either party has reason to expect that either sum would be realized at a forced sale. This is not a sale in which the other stockholders are to gain any advantage beyond the privilege, which is also offered to

the complainant, of taking his proportionate amount of cash
(3) or its equivalent stock in the new company, as he may prefer.
It is in effect a cash sale to strangers, approved by stock-
holders representing 3,675 shares against 75 held by the com-
plainant.   While this majority cannot affect any rights to
which he is entitled, it tends to show a fair price.   It is a
well-known result, to which courts of justice cannot be blind,
that large plants of this kind are often, if not usually, sold
at a great sacrifice in case of a forced sale.   We should not
have to go outside of the records of our own court to find
proof of this fact.   A sale being necessary, the question is
how shall it be made.   The prayer of the bill is that a re-
ceiver may be appointed; that the business may be wound
up and the company dissolved; and the argument is that the
sale of the effects should be at public auction.

The question, then, is whether the complainant is entitled
to such a decree.

(1)   There is a difference of opinion as to the power of a corpo-
ration to sell its entire property and thus practically to retire
from business.   Some courts hold that it may be done by the
consent of all the stockholders (Am. & Eng. Ency. L. 2 ed.
vol. 7, p. 734, note 1), and others hold that it may be done
by a majority.   *Ditto*, notes 2, 3, and 4.   All of the author-
ities cited in note 1, however, do not hold that the consent
of all the stockholders is necessary, *e. g. Treadwell* v. *Salis-
bury*, 7 Grey, 393; *Wilson* v. *Miers*, 100 Eng. Com. Law,
348, *et al.*   But the editor adds: "There seems to be no
doubt that it may do so when it is no longer able to profit-
ably continue its business."

We think that this is the correct rule.   It has been recog-
nized in this State.   *Hodges* v. *N. E. Screw Co.*, 1 R. I.
312, 350.   In *Wilson* v. *Prop'rs Central Bridge*, 9 R. I.
590, Brayton, C. J., said: "No case has been cited, and,
in view of the diligence of counsel in this case, we may
say there is no case which holds that where the purpose of
the incorporation could not be accomplished, the business
contemplated could not be carried on; where the capital had
been exhausted in endeavors to go on, having no means to

go further; a company thus laboring under burdens which they could no longer bear, could not release themselves by a surrender of their franchise to the State which granted and which was willing to receive it, and that by a majority. This is not only for their benefit, but it is a necessity, and it would be hard indeed if one stockholder could by his dissent prevent such relief against the prayer of all other members of the company." In *Peabody v. Westerly Water Works*, 20 R. I. 176, a necessary limitation to this rule was recognized in the words: "The action of the company was taken by a vote of more than 1,100 out of a total of 1,350 shares. There is no proof of unfairness, oppression, or fraud in such action. The case as presented is simply that of a stockholder who differs from a large majority of his fellow stockholders as to the expediency of a sale."

The principle upon which these cases rest is that a corporation may dispose of its property by a majority vote, in cases which are free from unfairness, oppression, and fraud. Against wrongs of this kind equity will interfere. To this effect are *Lauman* v. *Lebanon R. R.*, 30 Pa. St. 42; *Treadwell* v. *Salisbury*, 7 Gray, 393; *Leathers* v. *Janney*, 41 La. Ann. 1120; *Sewell* v. *East Cape May Co.*, 50 N. J. Eq. 717, *Sargent* v. *Webster*, 13 Met. 497; *Warfield* v. *Marshall*, 72 Ia. 666; *Wilson* v. *Miers*, 100 Eng. Com. Law, 348; see also *Miner's Ditch Co.* v. *Zellerbach*, 37 Cal. 543.

(2)    The complainant does not charge improper conduct, but simply that he considers the price inadequate and unjust; and hence he prays for a receiver and a sale of the property by auction. Ordinarily when a court orders a sale it can only be done by auction. A court cannot negotiate a private sale, and it orders an auction as the fairest chance for all parties to bid and buy. But when the parties in interest have negotiated a sale which is fair to all concerned, and there is nothing to show that a larger price may reasonably be expected, it does not follow that an auction sale would be ordered. This question was considered in *Quidnick Co.* v. *Chafee*, 13 R. I. 402, in which the trustee had an offer for the entire property, approved by nearly all the creditors.

Then other parties intervened, agreeing to bid the amount named at auction, and the court ordered a sale by auction. In the present case there is no evidence that anybody is willing to give as much as the offer proposed, or that there is any reason to suppose that it will bring as much or more. The only testimony put in by the complainant is that the tools will probably bring more than they are valued at by the company, while as to the bulk of the property, the real estate, &c., there is no evidence of market value. Moreover, the complainant does not show that he desires to bid upon the property himself, or that he knows of any one who would bid at a sale. In this absence of evidence that a larger total might be expected from an auction sale we see no reason to disturb the agreement already made, which, upon the testimony given, seems to be fair.

The complainant relies strongly on *Mason* v. *Pewabic Co.*, 133 U. S. 50. In that case the court had appointed a master to value the property, which he reported to be nearly $500,-000. A majority of the company had arranged a sale to themselves at $50,000. Naturally, in view of such gross inadequacy, the court ordered a sale by auction. The case was very different in its details from the case before us.

In *Wilson* v. *Prop'rs Central Bridge*, 9 R. I. 590, the city of Providence had control of the corporation and had sold the corporate property to itself. The court restrained the city from taking possession and ordered a sale by auction. That, too, was a different case from this one.

The court is bound to look to the interests of all parties, and especially to protect the rights of a minority from oppression and fraud. But where, as in this case, no such thing is charged, and nothing is shown to lead to the belief of a better total price, the complainant makes no case for interference. To show that movable tools may be sold at a price somewhat, but not largely, higher than that at which they are scheduled, is quite a different thing from showing that the plant as a whole would sell for more than the price offered. To set aside the sale under these circumstances would be to risk a certainty for an uncertainty, without any testimony on which

to base a hope of benefit to the stockholders from such inter-
ference.   We see no reason for such a step in the dark.

Bill dismissed.

*David S. Baker and Lewis A. Waterman,* for complainant.

*Comstock & Gardner,* for respondents.