Board of Com'rs of Creek County et al. v. Alexander, State Treasurer.

## BOARD OF COM'RS OF CREEK COUNTY *et al.* v. ALEXANDER, *State Treasurer.*

### No. 7873.    Opinion Filed July 11, 1916.

#### (159 Pac. 311.)

1. **STATUTES—Construction—Pari Materia.** It is a cardinal rule in the construction of statutes that the intention of the Legislature, when ascertained, must govern, and that to ascertain the intent all the various provisions of legislative enactments upon the particular subject should be construed together and given effect as a whole.

2. **SAME—Reason of Law.** When the language of a statute is dubious, the court. in construing it, will consider the reason and intent of the law to discover its scope and true meaning.

3. **SAME—Pari Materia.** Subsequent legislative enactments may be considered as an aid in the interpretation of prior legislation upon the same subject.

4. **SAME.** When it is apparent that a strict interpretation of a particular statute, construed alone, would defeat the intention of the Legislature as shown by other legislative enactments, which relate to the same subject, and which have been enacted in pursuance of and according to a general purpose in accomplishing a particular result, such construction should not be adopted.

5. **SAME—Declaration of Legislative Intent.** A joint resolution, duly passed by both branches of the Legislature, though not signed by the Governor, and thereby by section 11, art. 6, of the Constitution not having the force of a law, and which resolution was declaratory of the purpose and intent of a former act of the same Legislature, passed at a prior session, may be considered by the court as an aid in construing and giving effect to said former act.

6. **TAXATION—Distribution of Proceeds—Statutory Provision.** Under section 4, subd. "a." art. 2, of the act of March 11. 1915 (Sess. Laws 1915, ch. 107, p. 154), providing for a direct and indirect system of taxation, construed in connection with both prior and subsequent legislation, in reference to the distribution of the gross production tax upon petroleum or other mineral oil or natural gas, and the joint resolution of the Legislature declaratory of its intent in the passage of said act, one-half of the tax collected under the provisions of said statute should

be, by the State Treasurer, distributed to the county treasurer of the county from whence the tax was collected, to be apportioned among the school districts of such county in aid of the common schools of said county, upon a per capita basis, as are other common school funds.

(Syllabus by the Court.)

Original application for mandamus by the Board of County Commissioners of Creek County and another against W. L. Alexander, State Treasurer. Writ granted.

*McDougal, Lytle & Allen* and *Pryor & Rockwood*, for plaintiffs.

*S. P. Freeling*, Atty. Gen., and *Smith C. Matson*. Asst. Atty Gen., for defendant.

*Clarence Davis*, for school district No. 18, Creek County.

*Fred P. Branson*, Co. Atty., and *Glenn Alcorn* and *Francis Stewart*, Asst. Co. Attys., of Muskogee County, *amici curiae*.

SHARP, J. The present action involves primarily a construction of section 4, subd. "a," art. 2, of the act of March 11, 1915, levying and providing for the distribution of a gross production tax on petroleum or other mineral oil and on natural gas. The petition charges that since the passage of said act, and up to and including September 30, 1915, the State Auditor has collected from the different counties of the state paying a gross production tax large sums of money, a very considerable portion of which is now held in the depository of the treasurer of the state; that unless otherwise commanded by the mandate of this court, said officer will distribute and apportion the tax among all the counties from which any part or portion thereof was collected, in proportion to the school enumeration of such counties, whereas said State Treasurer should

58—5

pay over to the county treasurer of Creek county one-half of the taxes paid the State Auditor upon oil and gas produced in Creek county. The petition charges that up. to September 30, 1915, the State Auditor had collected from the different counties producing oil and gas and minerals upon which a gross production tax was collectible the respective sums set forth therein, and which petition also gives the school enumeration of said counties for the year 1915, said taxes and school enumeration being as follows:

| County | Taxes Paid | School Enumeration |
|--------|-----------|---------------------|
| Creek | $232,784.40 | 10.694 |
| Tulsa | 17,998.16 | 14,430 |
| Washington | 10,106.81 | 5,962 |
| Nowata | 7,447.86 | 4.589 |
| Muskogee | 2 389.89 | 18,593 |
| Okmulgee | 7.849.15 | 10,120 |
| Okfuskee | 19.42 | 8.397 |
| Payne | 289.37 | 9 092 |
| Rogers | 1.779.50 | 6,995 |
| Wagoner | 164.39 | 7,565 |
| Carter | 4,946.59 | 10,298 |
| Kay | 1,531.27 | 7,466 |
| Kiowa | 6.41 | 7.977 |
| Marshall | 16.14 | 5.669 |
| Osage | 13,202.19 | 7,085 |
| Pawnee | 4.118.99 | 5,459 |
| Stephens | 8.27 | 8,371 |
| Jefferson | 58.65 | 6,007 |
| Ottawa | 2,322.93 | 5,928 |
| Craig | 25.52 | 6,275 |
| Pushmataha | 24.54 | 4.909 |
| Le Flore | 23.98 | 12.988 |
| Pontotoc | 19.92 | 9,980 |
| Lincoln | 2.41 | 11,948 |

On the part of plaintiffs, as already indicated, it is claimed that one-half of the gross production tax paid on oil and gas produced in Creek county should by the State Treasurer be paid to the county treasurer of Creek county, to be distributed in aid of the common schools of said county, upon a *per capita* basis as are other common school

funds.  Counsel for Muskogee county, who have been given permission to file a brief herein, in effect say that the gross production tax should be divided among the several counties contributing thereto, in proportion to the school enumeration of such counties.  As between the contending forces, the Attorney General, who has filed a brief on the part of the defendant State Treasurer, disclaims any purpose of taking part in the controversy.  However, it is urged by the state's legal representative that, construing section 4 so as to apportion one-half of the tax among the different counties from which the tax is collected, in proportion to the school enumeration of such counties, as contended for by counsel appearing *amici curiae,* said section cannot be sustained; hence the tax must be distributed under section 4b of the act, which provides that in case section 4 shall, for any reason, become ineffective, then at once shall the proceeds of all gross production tax collected under the provisions of the act be paid into the general revenue fund of the state, and applied to the current expenses of the state government; any unexpended balance at the end of each fiscal year to be credited to the common school fund of the state, to be distributed as are other common school funds.  The wide divergence of views, the importance of the question not only to Creek county, but to all other counties of the state, and a proper understanding and construction of section 4 and related sections of the act of 1915, make proper a reference to the history of the several acts of the Legislature, levying a gross production or mining production tax on asphalt or ores bearing zinc, jack, gold, silver, copper, or petroleum or other mineral oil, or on natural gas.

The first act providing for such tax, passed and approved May 26, 1908 (Sess. Laws 1907-08, c. 71, pp. 640-

645), as amended by the act of March 27, 1909 (Sess. Laws 1909, c. 38, art. 2, pp. 624-626), provided that all funds collected thereby should be paid into the state treasury and credited to the general revenue fund of the state, for the payment of the expenses of the state government. The act of March 10, 1910 (Sess. Laws 1910, c. 44, pp. 66-70), provided for the levy and collection of a gross revenue tax, and directed that all taxes levied and collected pursuant thereto should be paid into the state treasury and applied to the payment of the ordinary expenses of the state government. Section 4, subd. "a," art. 2, of the act of March 11, 1915 (Sess. Laws 1915, c. 107, pp. 151-154), provides that all gross production revenues collected under the provisions of said act shall be paid into the state treasury, to be distributed as follows: (1) One-half to be credited to the general revenue fund of the state, and applied to the current expenses of the state government (and any unexpended balance at the close of each fiscal year shall be credited to the common school fund of the state, for distribution as are other common school funds); (2) the remaining one-half shall be by the State Treasurer distributed to "the county treasurer of the counties from whence the same was collected, in proportion to the school enumeration of such counties," and same shall be distributed in aid of the common schools of such counties upon a *per capita* basis as are other common school funds. Sections 1, 2, 3, and 4, subd. "a," art. 2, of said latter act were amended by an act of the Legislature passed at the extraordinary session of the Fifth Legislature and approved February 14, 1916 (Sess. Laws 1916, c. 39, pp. 102-110), whereby, among other changes, the tax on petroleum or other crude or mineral oil, or natural gas (less the royalty interest payable by the owner thereof),

was raised to a sum equal to 3 per centum of the gross value of the production, and which tax, it was provided, should be distributed as follows: Two-thirds to be paid to the State Treasurer by the State Auditor, to be credited to the general revenue fund of the state and applied to the current expenses of the state government; the remaining one-third to be paid to the county treasurer of the county from whence the oil or gas and other mineral was produced; one-half of the amount so paid to the county treasurer to be credited to the common school fund of the county in proportion to the school population of such county; the remaining one-half, so paid to the county treasurer, to be credited to a fund of such county known as the road and bridge fund.

The act of May 26, 1908, the amendatory act of March 27, 1909, and the act of March 10, 1910, each provided that the gross revenue tax therein levied should be in addition to the taxes levied and collected upon an *ad valorem* basis upon the mining, oil, or gas property subject to the production tax. The act of March 11, 1915, undertook to relieve the property or business subject to the gross revenue tax of any other form of taxation, by providing that the tax should be in lieu of any other method of taxing the same (with certain exceptions not here involved). The act of February 14, 1916, provides that the payment of the gross production tax imposed by the terms of the act shall be in full and in lieu of all taxes by the state, counties, cities, towns, townships, school districts, and other municipalities, upon any property rights attached to or inherent in the right to the minerals named in the act. Other exemptions not pertinent to the present case are provided for in said act. According to the acts of 1908, 1909, and 1910, the entire

gross production tax was paid into the state treasury, and, according to the act of 1909, "credited to the general revenue fund of the state for the payment of the expenses of the state," while by the 1910 act the tax was to be "applied to the payment of the ordinary expenses of the state government."

The 1915 act evinces a radical departure from the earlier acts in this: The 1908 act levied a tax of one-half of 1 per centum of the gross receipts from the total production of petroleum or other mineral oil, or of natural gas, as did the amendatory act of 1909 and the act of 1910. In the 1915 act, when for the first time the property subject to the production tax was relieved of an *ad valorem* tax, the gross revenue tax was increased to 2 per centum of the gross value of the production of petroleum or other mineral oil, or natural gas; while under the 1916 act the tax was fixed at 3 per centum of the gross value of the production, less the royalty interest paid by the owner thereof. The 1915 act provided that one-half of the 2 per cent. tax should be credited to the general revenue fund of the state and applied to the current expenses of the state government, provision being made for any unexpended balance at the close of each fiscal year, the remaining one-half to be by the State Treasurer distr.buted to "the county treasurer of the counties from whence the same was collected, in proportion to the school enumeration of such counties," to be distributed in aid of the common schools of such counties upon a *per capita* basis, as are other common school funds. The 1916 act provides that one-third of the 3 per cent. tax shall be paid to the county treasurer, one-half to be credited to the common school funds of the county, and the remaining one-half to be credited to a fund of such county

known as the road and bridge fund. Under said latter act the county from whence the oil and gas or other mineral was produced received from the State Auditor the tax paid on production in that county.

From the foregoing it will be seen that until the passage of the act, the construction if not the validity of which is involved, the oil and gas industry, except perhaps oil and gas leases, contributed to the local municipalities, in theory at least, its just share of the burdens of-taxation. From the table showing the tax paid by the several producing counties, and the school population thereof, it appears that during the period named Creek county paid a production tax of $232,784.40, while Lincoln county paid a production tax of $2.41. The school enumeration of Creek county for the year 1915 was 10,693, of Lincoln county, 11,948, so that if the tax is to be distributed among the different counties contributing thereto, in proportion to the school enumeration of such counties, then Lincoln county, whose production was a mere negligible quantity, will receive from the State Treasurer a larger sum than will Creek county. According to the petition, the total tax paid into the state treasury up until September 30, 1915, was $307,136.76; the total school enumeration of the counties involved, for the year 1915, was 206,797. Of this, in round numbers, Lincoln county had 6 per cent. of the total scholastic population, and would receive out of the gross production tax, according to the contention of counsel appearing *amici curiae,* a total of $9,214.10. Not only would Creek county receive less of said tax than Lincoln county, but by the act it is prevented from levying and collecting an *ad valorem* tax on not only the oil and gas produced, but the equipment and machinery in and around any well

producing natural gas or petroleum or other mineral oil, and used in the actual operation of such producing well. At the same time, Lincoln county, relying not upon the production tax paid by it, but upon its school enumeration, in addition to the enforced tribute from Creek county, is authorized to collect an *ad valorem* tax on all the property subject to taxation in said county, except the unsubstantial amount from which its share of the gross production tax is paid. To distribute the taxes on hand among the several counties of the state paying the gross production tax, according to the school enumeration all the counties contributing thereto, irrespective of the amount of the tax paid by the several counties, would be in effect to create of these counties a taxing district, and would exclude from participation in the benefits arising from such tax all other school children of the state. To so hold would be to wholly disregard all equitable principles in respect to the apportionment of the tax, especially in view of the fact that said tax is levied and collected in lieu of an *ad valorem* tax. It should be kept in mind that the county officers of Creek county are not complaining that one-half of the tax paid on oil or gas produced in said county will be credited to the general revenue fund of the state and applied to the current expenses of the state government. It is of the wrongful construction of the latter half of section 4 by the State Treasurer, and the attendant consequences, that complaint is made and relief invoked. The difficulty presented arises out of the interpretation of said section, or of the latter portion thereof, providing for the apportionment of one-half of the tax. It will first be observed that one-half of the tax shall be distributed, not as contemplated by section 3, art. 11, of the Constitution, providing for the apportionment of

the interest and income of the permanent school fund, etc., "among and between the several common school districts of the state, in proportion to the school population of the several districts," but instead, shall be distributed by the State Treasurer "to the county treasurer of the counties from whence the same was collected." Thus far the act is clear and unambiguous, the element of doubt and uncertainty being introduced by the clause immediately following: "In proportion to the school enumeration of such counties." Standing alone, the latter clause would indicate a purpose to apportion the tax collectively among the several counties from which it was collected, according to the school enumeration of such counties. The next clause, and a part of the same sentence, provides:

"And the same shall be distributed in aid of the common schools of such county upon a *per capita* basis as are other common school funds."

Construing the clause, "in proportion to the school enumeration of such counties," to have reference to the apportionment of the tax among the school districts of the county, no difficulty will be encountered in making the statute mean that one-half of the tax shall be paid back to the counties from whence the same was collected. Such, as we shall presently see, was the legislative intent. Any other construction, if section 4 is to be given effect, would be to take from the heavy producing counties, through the instrumentality of the State Auditor, and to pay over to the smaller producing counties, through the State Treasurer, taxes paid by the former, for the support of the public schools of the latter. From this conclusion there is no escape whatever. A further effect would be to make of the counties of the state, in which a mining production tax was paid, a taxing district from which all other counties in the state would

138 SUPREME COURT OF OKLAHOMA.

Board of Com'rs of Creek County et al. v. Alexander, State Treasurer.

be excluded. Distribution of the tax would depend, not upon the amount of the tax paid by a particular county, but upon the ratio that the school enumeration of such county bore to the total school enumeration of the taxing district. A conclusion so oppressive and inequitable should be avoided if the same can be done without doing violence to the wording of the statute. The language used does not convince us that there was a purpose on the part of the Legislature to depart from the well-beaten paths commonly traveled for the distribution of school taxes among the respective counties from whence the tax was collected. Had the Legislature the power to create of producing counties a taxing district (which we do not decide), and desired to do so, we entertain no doubt but that its members would have readily found suitable language in which to have made such purpose clear.

In construing statutes, where a construction is made necessary, it is a familiar rule that acts *in pari materia* should be construed together, so as to harmonize and give effect to their various provisions. *Diggs v. Lobsitz,* 4 Okla. 232, 43 Pac. 1069; *Garton v. Hudson-Kimberley Pub. Co.,* 8 Okla. 631, 58 Pac. 946; *Hughes v. Territory,* 8 Okla. 28, 56 Pac. 708; *Wright v. Jacobs,* 12 Okla. 138, 146, 70 Pac. 193; *Groom v. Wright,* 30 Okla. 652, 121 Pac. 215; *Beaty v. State ex rel. Lee,* 35 Okla. 677, 130 Pac. 956; *Ratliff v. Fleener,* 43 Okla. 653, 143 Pac. 1051. This is especially the case where the acts are passed at the same session, or, though at different sessions, by the same body. It is to be presumed in such case that the different acts were imbued by the same spirit, and actuated by the same policy; and hence they should be construed each in the light of the other. Within less than one year of the passage and approval of the statute in question, the Fifth

Legislature, the membership of which was the same as that of the regular 1915 session (except where vacancies occurred, caused by death or resignation), at an extraordinary session, passed the act of February 14, 1916, giving to the counties from whence the oil or gas or other mineral was produced, one-third of the tax collected therefrom. Both acts treat of the same general subject-matter, i. e., the levy, collection, and apportionment of a gross production tax. The latter act was a part of the general scheme of taxation, and both included a very considerable portion of the taxable wealth of the state; and the statutes in relation thereto should be construed, if possible, so as to make the plan or system consistent in all of its parts, and uniform in its operation, unless, of course, a contrary purpose is manifest. *Harris v. State,* 96 Tenn. 496, 34 S. W. 1017; *Board of Supervisors v. People,* 49 Ill. App. 369; *MacVeagh v. Royston,* 71 Ill. App. 617 (affirmed in 172 Ill. 515, 50 N. E. 153); *Conn v. Board of Commissioners,* 151 Ind. 517, 51 N. E. 1062; *Cincinnati v. Connor,* 55 Ohio St. 82, 44 N. E. 582. As said by the Supreme Court of Massachusetts:

"Where statutes are parts of a general system relating to the same class of subjects, and rest upon the same reason, they should be so construed, if possible, as to be uniform in their application and in the results which they accomplish." ( *Sheldon v. Boston & A. R. R. Co.,* 172 Mass. 180, 51 N. E. 1078).

In *Tiger v. Western Investment Co.,* 221 U. S. 309, 31 Sup. Ct. 584, 55 L. Ed. 738, it is said:

"When several acts of Congress are passed, touching the same subject-matter, subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject" (citing *Cope v. Cope,* 137 U. S.

682, 11 Sup. Ct. 222, 34 L. Ed. 832; *United States v. Freeman*, 3 How. 556, 11 L. Ed. 724).

Statutes upon cognate subjects may be referred to, though not strictly *in pari materia*. *Smith v. People*, 47 N. Y. 330; *Whitcomb v. Rood*, 20 Vt. 49; *Irelan v. Colgan*, 96 Cal. 413, 31 Pac. 297; *Cummings v. Everett*, 82 Me. 260, 19 Atl. 456; *State v. Woodson*, 128 Mo. 497, 31 S. W. 105; *State v. Beck*, 21 R. I. 288, 43 Atl. 366, 45 L. R. A. 269.

Of the rule, it is thus stated in Lewis' Sutherland, Statutory Construction, sec. 443:

"All consistent statutes which can stand together, though enacted at different dates, relating to the same subject, and hence briefly called statutes *in pari materia*, are treated prospectively, and construed together as though they constituted one act. This is true, whether the acts relating to the same subject were passed at different dates, separated by long or short intervals, at the same session or on the same day. They are all to be compared, harmonized if possible, and if not susceptible of a construction which will make all of the provisions harmonize, they are made to operate together so far as possible consistently with the evident intent of the latest enactment. It is to be observed that in the comparison of different statutes passed at the same session, or nearly at the same time, this circumstance has weight; for it is usually referred to as indicating the prevalence of the same legislative purpose, as rendering it unlikely that any marked contrariety was intended."

No reason existed for the distribution of the 1915 production tax among the counties according to plans so widely variant from that provided for in the 1916 act. The latter act is clear and explicit, and provides that one-third of the 3 per cent. tax shall be returned to the county from whence the oil or gas or other mineral was

produced.  The former statute, construed in connection
with the latter, requires but a slight change or transpo-
sition of words to make its meaning quite as clear as
the latter.  This court has frequently held that in the con-
struction of statutes, when the intention of the Legisla-
ture is apparent, words may be modified, altered, or sup-
plied, to give the enactment the force and effect which
the Legislature intended.  *Territory ex rel. Sampson v.
Clark, Trustee,* 2 Okla. 85, 35 Pac. 882; *Trapp, Auditor, v.
Wells Fargo Express Co.,* 22 Okla. 377, 97 Pac. 1003; *State
ex rel. Caldwell v. Hooker,* 22 Okla. 712, 98 Pac. 964;
*State ex rel. Reardon v. Hooker,* 26 Okla. 460, 109 Pac.
527; *Schaffer v. Board of Commissioners,* 33 Okla. 288,
124 Pac. 1069; *Beaty v. State ex rel. Lee,* 35 Okla. 677,
130 Pac. 956; *Trustees', Executors' & Securities' Ins.
Corp., Ltd., v. Hooton,* 53 Okla. 530, 157 Pac. 293.

The rule of construction announced is unaffected by
section 7 of the 1916 statute, the purpose of which was
to make clear that prior taxes should be collected and dis-
tributed under the old law, and not that the latter statute
could not be taken as an aid in the construction of the
former.  If the statute is valid, it is to have effect ac-
cording to the purpose and intent of the lawmakers.  The
intention is the vital part, the essence of the law, and the
primary rule of construction is to ascertain and give effect
to that intent.  If a statute is plain, certain, and unambig-
uous, so that no doubt arises from its own terms as to its
scope and meaning, a bare reading suffices; then interpre-
tation is needless.  Where the intention of the statute
has been ascertained by the application of the rules of in-
terpretation, they have served their purpose, for all such
rules are intended to reach that intent.  The rules of
construction with which the books abound apply only

where the words used are of doubtful import. They are so many lights to assist the court in arriving with more accuracy at the true interpretation of the intention. These rules are part of the law of the land, equally with the statutes themselves, and not much less important. The functions of such interpretation, unrestrained by settled rules, would introduce great uncertainty, and would involve a power virtually legislative. The intention of the Legislature in the passage of the act may be arrived at in many ways. In the present case that intent is made clear by the passage, at the extraordinary session of the Legislature, and during the last week of the session, of a joint resolution declaratory of its aim in the passage of the 1915 act, which in part reads:

"That it was the purpose and intent of the Legislature, and shall be so construed, that the remaining one-half of said gross production tax shall be by the State Treasurer paid to the county treasurer of the county from whence the oil or gas or other mineral was produced, to be by the said county treasurer distributed in aid of the common schools of such county upon a *per capita* basis, as are other common school funds, it being the intent and purpose to give back to each county producing the oil or gas or other mineral one-half of said gross production tax for the purpose of carrying on the schools of the county."

This resolution was not signed by the Governor; hence, under section 11, art. 6, of the Constitution, has not the force of a law. Though it does not come to us in such character, it is evidence of high class of the legislative intent. The due passage and enrollment of the resolution by the Legislature is a matter of contemporaneous history; the act of a co-ordinate branch of the state government, of which we may take notice. We know judi-

cially of its passage, as well as of its contents; and, as courts are not confined to the acts of the Legislature in ascertaining the legislative intent, it is both competent and proper that in construing the statute due consideration should be given said declaratory resolution. Lewis' Sutherland, Statutory Construction, secs. 4770, 4771.

We think it may fairly be presumed that it was the purpose of the Legislature to compensate the county from which the production tax was collected for the loss of the *ad valorem* tax collected under the two original acts, by paying back to such county, to be distributed according to law, a portion of the tax collected for its account by the state authorities. A fair and equitable interpretation of the statute, in the light of the manifest purpose and intention of the Legislature, considering the history of other legislation upon the same subject, and construing it in connection with the subsequent act providing that a portion of the tax should go, not to the counties that participated in the payment thereof, but to the county from whence the tax was collected, together with the joint resolution of the same Legislature that passed the 1915 act, makes clear the purpose of the Legislature.

Having so ascertained, the statute should be construed so that one-half of the tax collected would be distributed to the county treasurer of the county from whence the same was collected, to be by said officer distributed in proportion to the school enumeration of such county, in aid of the common schools of said county, upon a *per capita* basis, as are other common school funds. Such a distribution, except possibly as to the local county officer having the apportionment thereof, would harmonize with the requirements in that regard found in section 7694, Rev. Laws 1910, making it the duty of the county super-

intendent to apportion the state school funds, together with the unapportioned county school funds in the county treasury, including all fines, forfeitures, and escheats, which may have accrued to such fund, among the school districts and parts of districts in such county, and in the ratio of the number of persons of school age residing in each district or part of district, as shown by the last annual reports of the several clerks of such districts and parts of districts.

As it appears that the State Treasurer's position has been induced largely through a doubt entertained by him as to his duty in the proper distribution of the gross production taxes collected under the 1915 statute, in view of our construction of the act, no question is entertained but that said officer will promptly proceed to the apportionment of said tax in conformity to the views herein expressed, and until otherwise ordered the issuance of a peremptory writ will be withheld.

All the Justices concur.