DE HASQUE v. ATCHISON, T. & S. F. RY. CO.

No. 9694—Opinion Filed May 21, 1918.

(173 Pac. 73.)

(Syllabus.)

1. **Intoxicating Liquors—Receipt from Common Carrier — Sacramental Purposes—Statute.**

Chapter 186, Session Laws 1917, prohibiting the receiving of liquors, the sale of which is prohibited by the laws of this state, from a common carrier, does not make it an offense for a Roman Catholic priest to receive altar wine to be used solely for sacramental purposes in divine worship.

2. **Same—Sale and Transportation.**

The provisions of section 46, art. 25, of the Constitution (section 410, Wms. Anno.), prohibiting the sale and transportation of intoxicating liquors, does not apply to altar wine to be used solely for sacramental purposes in divine worship, although such wine be capable of use as a beverage, and, if drunk in sufficient quantities, will produce intoxication.

3. **Statutes—Letter and Spirit of Law.**

A thing may be within the letter of the law and yet not within the law, because not within its spirit, nor within the intent of its makers.

4. **Same—Construction—Purpose of Act.**

Among other things which may be considered in determining the intent of the lawmakers is the evil which it is designed to remedy; and therefore this court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the lawmakers.

5. **Same—Offenses—Intent of Legislature.**

No purpose of action against religion and religious institutions, when properly conducted, can be imputed to any legislative body.

6. **Constitutional Law — Statutes — Construction — Intent of Legislature—Subsequent Enactments.**

It is a cardinal rule in the construction of constitutions and statutes that the intention of the lawmakers, when ascertained, must

govern, and that to ascertain the intent all the various portions of the legislative enactments upon the particular subject, including subsequent enactments, should be construed together and given effect as a whole.

**7. Statutes—Construction—Strict Interpretation—Intent of Legislature.**

When it is apparent that a strict interpretation of a particular statute, construed alone, would defeat the intention of the Legislature as shown by other legislative enactments which relate to the same subject, and which have been enacted in pursuance of and according to a general purpose in accomplishing particular results, the suppression of a particular evil, such construction should not be adopted.

**8. Same—Construction By Administrative Officers.**

Construction placed on the laws by officers charged with the enforcement thereof in the discharge of their duties, at or near the time of their enactment, which has long been acquiesced in, is a just medium for their judicial interpretation.

Error from District Court, Oklahoma County; George W. Clark, Judge.

Action for mandamus by Urban De Hasque against the Atchison, Topeka & Santa Fe Railway Company. Judgment for defendant, and plaintiff brings error. Reversed and cause remanded, with directions to grant the relief prayed for.

Wilson, Tomerlin & Buckholts, Mont. F. Highley, and Fulton, Shirk & Danner, for plaintiff in error.

J. R. Cottingham and S. W. Hayes, for defendant in error.

S. P. Freeling, Atty. Gen., for the State.

OWEN, J. This action was brought by plaintiff in error, in the district court of Oklahoma county, for mandamus to compel defendant in error to accept a shipment of wine tendered by plaintiff in error at Oklahoma City to be delivered to the Reverend John Van Gastel, a Catholic priest at Guthrie, Oklahoma, and to compel the railway company to accept like shipments, transport and deliver the same, whenever tendered, both intrastate and interstate. The action was brought by plaintiff in error on behalf of all members of the Roman Catholic faith alleging that he is a Roman Catholic priest, and chancellor to the Catholic diocese of Oklahoma, and secretary to the Right Reverend Theopile Meerschaert, Roman Catholic bishop of Oklahoma. He alleges a part of his duties under the bishop to be that of providing to the 105 Catholic priests and their congregations within the state of Oklahoma sufficient altar wine for conducting the religious service of the Roman Catholic Church known as the Sacrifice of the Mass.

It appears from the agreed statement of facts that the package tendered was marked "For Sacramental Purposes," and contained pure, fermented, unadulterated juice of the grape, commonly known as altar wine, manufactured and prepared in the particular manner prescribed by the church, and to be used for the sole purpose of conducting the religious service of that church known as the Sacrifice of the Mass, and that this wine is capable of being used as a beverage, and can be drunk in sufficient quantities to produce intoxication.

It appears further from the stipulation that the practice of the Sacrifice of the Mass within the territorial limits now comprising the state of Oklahoma, and the use of this fermented altar wine, has been observed by the clergy of the Roman Catholic Church in the celebration of the Sacrifice of this Mass continuously since the time of Coronado, in the year 1540, and was a practice observed within this territory at the date of the treaty between the United States of America and the Republic of France (Act April 30, 1803, 8 Stat, 200, art. 4), by which the territory of Louisiana was ceded to the United States of America. And it appears that the diocese of Oklahoma consists of the priesthood of about 105 in number, and in excess of 42,000 members, more than 100 churches, numerous parochial schools, hospitals, convents, seminaries, and various charitable and eleemosynary and educational institutions owned, controlled, and operated, both for gain and charitable purposes, by the priesthood and Sisters of Charity, and members of the Roman Catholic Churches. There is observed and conducted within these institutions this religious ceremony and service known as the Sacrifice of the Mass, and that for such service the especially prepared and fermented altar wine is required as a necessary part of the worship.

It is stipulated to be the faith and belief of all Catholics that the use of the fermented wine is a necessary part of this service in commemoration of the Last Supper, at which time Christ gave wine to the Apostles, saying, "Drink ye of this, for this is my Blood of the New Testament, which shall be shed for many unto the remission of sins." And commanded the Apostles also, "This do for a commemoration of me."

It is also stipulated that this sacrifice, according to the Roman Catholic faith, is not one of praise and prayer merely, but is an

external sensible act, signifying the most profound homage to God, and is to all Catholics the supreme act of worship and adoration; of all acts the most acceptable to God; that any law prohibiting the Sacrifice of the Mass does, in effect, prohibit all Catholics within the state of Oklahoma from worshiping God according to their faith and belief.

The shipment was refused by the defendant in error for the reason, as claimed, to do so would be · in violation of chapter 186, Sess. Laws 1917, commonly referred to as the "Bone-Dry Law." Section 1 of this act reads:

"It shall be unlawful for any person in this state to receive directly or indirectly any liquors, the sale of which are prohibited by the laws of this state, from a common or other carrier."

The question presented is whether the laws of this state prohibiting the sale of intoxicating liquors include such altar wine.

The trial court, in refusing plaintiff relief, held the general language found in section 46, art. 25, of the Constitution to include such wine. That section reads:

"The manufacture, sale, barter, giving away, or otherwise furnishing, except as hereinafter provided, of intoxicating liquors within this state, or any part thereof, is prohibited for a period of twenty-one years from the date of the admission of this state into the Union. * * * Any person, individual or corporate, who shall manufacture, sell, barter, give away, or otherwise furnish any intoxicating liquor of any kind including beer, ale, and wine, contrary to the provisions of this section, * * * or who shall ship or in any way convey such liquors from one place within this state to another place therein, * * * shall be," etc.

Counsel for defendant in error urge with much force that the general terms "intoxicating liquor of any kind, including beer, ale, and wine," as used in the Constitution, include such wine as may be used for sacramental purposes. To give weight to this argument it is pointed out that under the provisions of the Constitution and Enabling Act lawful purchases might be made for medicinal, industrial, and scientific purposes, under certain regulations. It is urged that because sacramental wine was not excepted from the general terms, it must be held to be included, invoking the rule announced in Lewis' Sutherland, Statutory Construction, 705:

"Where the Legislature has made no exceptions, the courts of justice can make none, as this would be legislative."

The case of Delaney v. Plunkett, 146 Ga. 547, 91 S. E. 561, L. R. A. 1917D, 926, Ann. Cas. 1917E, 685, is relied upon where it was held that, when the state undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. And that a transaction which, separately considered, may be innocuous, may nevertheless be included in a prohibition, the scope of which is regarded as essential to accomplish the purpose of the act. The transaction referred to in that case was having a large quantity of intoxicating liquors for personal use, which was held to be included in the terms and purpose of the prohibition statute. We are not unmindful of this rule, but, in our opinion, it has no application here.

The cardinal rule of constitutional and statutory construction is to arrive at the intention of the legislative body. Ex parte Whitehouse, 3 Okla. Cr. 97, 104 Pac. 372. It must be conceded that any fermented and intoxicating wines fall within the general terms of the Constitution. But from the early days of jurisprudence it has been held a thing may be within the letter of the law and yet not within the law, because not within its spirit, nor within the intention of its makers. In the case of Stradling v. Morgan, 2 Eliz. (First Plowden) 205, it was said:

"From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the law in some appearances, and those statutes which comprehend all things in the letter they have expounded to extend but to some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter they have adjudged to read to some persons only, which expositions have already been founded upon the intent of the Legislature, which they have collected, sometimes by considering the cause and necessity of making the act. * * * So that they have ever been guided by the intent of the Legislature, which they have always taken according to the necessity of the matter and according to that which is consonant to reason and good discretion."

A guide to the meaning of the section of the Constitution is found in the evil which it was designed to remedy; and therefore this court may properly consider the situation as it existed and as it was pressed upon the attention of the members of the Constitutional Convention. It is a matter of common knowledge that prior to the passage of

the Enabling Act the use of intoxicating liquors among the Indians was the fruitful source of much crime. The Congress of the United States, recognizing this situation, and to suppress this traffic, enacted stringent laws against the sale and importation of intoxicating liquor of every kind in the Indian country (Act Cong. July 23, 1892, c. 234, 27 Stat. 260; Act Cong. March 1, 1895, c. 145, 28 Stat. 693; Act Cong. Jan. 30, 1897, c. 109, 29 Stat. 506 (U. S. Comp. St. 1916, § 4137]), and, in order that this traffic might not be resumed on the coming of statehood, the Enabling Act required the inhibition found in section 46, art. 25. That these provisions might extend and be applied throughout the entire state, the section was submitted to the people, and on its adoption became a part of our constitutional law. All this legislation had but one purpose, to conserve the morals and guarantee the safety of the public by suppressing the use and traffic of intoxicating liquors and prevention of kindred and resulting evils. We do not believe that the members of Congress and the Constitutional Convention, in framing this section, had in mind the sacred use of wine in the sacramental service in connection with the suppression of this evil.

General terms of the statutes or the Constitution must be construed in the light of their common ordinary usage and meaning. While it appears the altar wine in question is intoxicating, if drunk in sufficient quantities, yet it can hardly be said, it seems to us, that the term, "intoxicating liquors," as commonly used in prohibition statutes, includes such wine when used in divine worship. The object and purpose of prohibition statutes is to prevent the intemperate use of intoxicating liquors with the attending and consequential evils. The use of wine in this sacred service forms no part of this evil.

We are not without authority in considering these conditions. In the case of Henry v. Tilson, 17 Vt. 479, it was said:

"The history of the legislation, of the state, in reference to the subject-matter of a particular statute, may be referred to, as tending to aid in the construction to be given to the statute.

"Where the literal interpretation of a statute would lead to a gross absurdity of restriction, the court will extend its application to cases within the same equity, though at the expense of forcing the construction of the words."

In the case of Margate Pier Co. v. Hannam, 3 Barn. & Ald. 266, Chief Justice Abbott quoted from Lord Coke as follows:

"Acts of Parliament are to be so construed as no man that is innocent or free from injury or wrong be, by literal construction, punished or endangered."

In the case of State v. Clark, 29 N. J. Law, 96, Clark was indicted under a statute which made it a crime to open or break down any fence in the possession of another. He offered to prove a legal right to enter on the premises, although in the possession of another. The lower court denied him that right, and in reversing the case it was held that the purpose of the act was to prevent trespass, and that, while he had violated the letter of the act, he had not violated the spirit. It was said:

"If a literal construction of the words of a statute make the act absurd, it must be so construed as to avoid the absurdity. The literal import of the terms and phrases employed will be controlled by the objects which the act was designated to reach."

In the case of U. S. v. Kirby, 7 Wall. (74 U. S.) 482, 19 L. Ed. 278, Kirby and others were indicted, charged with violating the United States statutes against obstructing the passage of the mail, or in any manner retarding the passage of the mail carrier. Farris, a carrier of the mail, was arrested by Kirby and others on a bench warrant issued out of the circuit court of Kentucky, and taken from a steamboat carrying the United States mail. He pleaded as a defense that he was acting in obedience to the warrant. Upon demurrer to his defense the case was certified to the Supreme Court. The questions presented were:

"First. Whether the arrest of the mail carrier, upon the bench warrants from the circuit court of Kentucky, was, under the circumstances, an obstruction of the mail, within the meaning of the act of Congress. Second. Whether the arrest was obstructing or retarding the passage of the carrier of the mail, within the meaning of that act."

In holding the delay and interference incident to the arrest did not fall within the terms of the act, it was said:

"When the acts which create the obstruction are within themselves unlawful, the intention to obstruct will be imputed to their author, although the attainment of other ends may have been his primary object. The statute has no reference to acts lawful in themselves, from the execution of which a temporary delay to the mails unavoidably follows. * * * The public inconvenience which may occasionally follow from the temporary delay in the transmission of the mail caused by the arrest of its carriers upon such charges, is far less than that which would arise from extending to them the immunity for which the counsel of the

government contends. Indeed, it may be doubted whether it is competent for Congress to exempt employes of the United States from arrest on criminal process from the state courts, when the crimes charged against them are not merely mala prohibita, but are mala in se. But whether legislation of that character be constitutional or not, no intention to extend such exemption should be attributed to Congress, unless clearly manifested by its language. All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language which should avoid results of this character. The reason of the law in such cases should prevail over its letter."

In the case of Reiche v. Smythe, 13 Wall. (80 U. S.) 162, 20 L. Ed. 566, it was said:

"The meaning of general words" in a statute must be restricted "whenever it is found necessary to do so in order to carry out the legislative intention."

In the case of Ex parte Ellis, 11 Cal. 222, it was said:

"A familiar rule in the construction of statutes is to give effect to the meaning and interpretation of the lawmaker. This may be gathered from the reason of the statute: 'the motives which led to the making of it, the object in contemplation at the time the act was passed.'"

In the case of the Church of the Holy Trinity v. U. S., 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226, the act of Congress under review made it unlawful to prepay the transportation, or in any way assist or encourage the importation or immigration, of any alien or foreigner into the United States under contract or agreement to perform labor or services of any kind in the United States. The plaintiff in error there made a contract with an alien minister, residing in England, by the terms of which he was to remove to the city of New York and enter into its service as rector and pastor. It was claimed this contract was forbidden by the act of Congress. The United States Circuit Court held that the contract was within the prohibition of the statute, and rendered judgment accordingly. The judgment was reversed by the Supreme Court, holding that, while the contract was within the letter of the statute, it was not within the statute, because not within the spirit nor within the intention of its makers. This intention of the act, it was held, was to prevent importation of cheap, unskilled labor, and to prevent the practice of large capitalists in this country to contract with their agents abroad for the shipment of large numbers of ignorant and servile laborers under contracts, by which the employer agreed, upon the one hand, to prepay their passage, while on the other hand, the laborers agreed to work after their arrival for a certain time at low wages. The effect of this was to break down the labor market and to reduce other laborers engaged in the occupations to the level of the assisted immigrant, and was never intended to include or prevent the employment of a minister to conduct religious services. Mr. Justice Brewer, in delivering the opinion of the court, said:

"But beyond all these matters no purpose of action against religion can be imputed to any legislation, state or national, because this is a religious people. This is historically true. From the discovery of this continent to the present hour there is a single voice making this affirmation. The Commission to Christopher Columbus, prior to his sail westward, is from 'Ferdinand and Isabella, by the Grace of God, King and Queen of Castile,' and recites that it is hoped that by God's assistance some of the continents and islands in the ocean will be discovered,' " etc.

Coming nearer to the present time, we may call attention to the provisions of section 3 of the Enabling Act, which required our Constitutional Convention to provide in the Constitution that perfect toleration of religious sentiment shall be secured, and that no inhabitant of this state shall ever be molested, in person or property, on account of his or her mode of religious worship. And this provision appears as section 2, art. 1, of the Constitution. In the Constitutions of the various states we find the constant recognition of religious obligations. We find language which, either directly or by clear implication, recognizes a profound reverence for religion, and an assumption that its influence is essential to the well-being of the community. The preamble to our own Constitution is:

"Invoking the guidance of Almighty God, in order to secure and perpetuate the blessing of liberty; to secure just and rightful government; to promote our mutual welfare and happiness, we, the people of the state of Oklahoma, do ordain and establish this Constitution."

The happiness of any people, and the good order and preservation of any government, must essentially depend upon piety, religion, and morality. These cannot be generally diffused throughout a community, except by the institution of the public worship of God and of public instruction in piety and re-

ligion. We should not impute to the framers of our Constitution, and to the members of Congress who enacted the Enabling Act, the intention to prevent or interfere with public worship under the general terms to suppress the liquor traffic.

Mr. Justice Brewer, in the Church Case, supra, made use of this illustration:

"Suppose in the Congress that passed this act some member had offered a bill which in terms declared that, if any Roman Catholic Church in this country should contract with Cardinal Manning to come to this country and enter into its services as pastor and priest; or any Episcopal Church should enter into a like contract with Canon Farrar; or any Baptist Church should make similar arrangements with Rev. Mr. Spurgeon; or any Jewish Synagogue with some eminent rabbi—such contract should be adjudged unlawful and void, and the church making it be subject to prosecution and punishment—can it be believed that it would have received a minute of approving thought or a single vote? Yet it is contended that such was, in effect, the meaning of this statute. The construction invoked cannot be accepted as correct. It is a case where there was presented a definite evil, in view of which the Legislature used general terms with the purpose of reaching all phases of that evil, and unexpectedly, it is developed that the general language thus employed is broad enough to reach cases and acts which the whole history and life of the country affirm could not have been intentionally legislated against. It is the duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the Legislature, and therefore cannot be within the statute."

Suppose in our Constitutional Convention some member had offered a section which in express terms declared against the use of wine in sacramental services by any church within this state, and that the transportation and use of such wine, solely for such purpose, would subject the members of that church to prosecution and punishment; can it be believed it would have received a minute of approving thought or a single vote?

We have here a case where there was presented a definite evil, intoxication and intemperance incident to the ordinary use and traffic in intoxicating liquors, in view of which the members of the Constitutional Convention used general terms with the purpose of reaching all phases of that evil. The general language used is broad enough, in its literal interpretation, to cover such fermented wine used for sacramental purposes, which the whole history and life of this nation affirms could not have been intentionally legislated against. In the ordinary transactions of life we find everywhere a clear and positive recognition of the importance and necessity of public worship, and the fostering in every way possible of religious institutions. The custom of opening sessions of deliberate bodies and most conventions with prayer; our laws requiring observance of the Sabbath; the general cessation of all secular business, the closing of courts and Legislatures. and other similar public assemblies on the Sabbath; the various churches and church organizations, which abound in every city, town, and community; the multitude of charitable organizations existing all over the country under Christian auspices; the missionary societies and associations which receive general support in aiming to establish the Christian religion in every quarter of the globe— these, and many other matters which might be noticed, are emblems of Christianity, and emphasize that "man's chief and highest end is to glorify God, and fully to enjoy Him forever." That he may do so intelligently and according to the dictates of his own conscience is the primary purpose of all Christian civilization. The general terms used in the prohibition section of the Constitution should not be construed to prevent religious worship, and in that manner defeat the very purpose of the act, which was to conserve morality and religion by preventing intemperance and intoxication.

The well-known rule of contemporaneous construction applies here. The aid of contemporaneous construction may be invoked when the language of the statute is doubtful and cannot be made plain by the help of any other part of the same statute. Under such circumstances the court may consider the construction put upon the act when it first came into operation. 1 Kent, Com. 445; Lewis' Sutherland Stat. Con. 472. Upon examination of the various acts of the Legislature since statehood, we find that sacramental wines were expressly excepted from the provisions of the act of 1907-8 (Laws 1907-1908, c. 69) and in each succeeding act. From this it appears the Legislature construed the provisions of the Constitution not to include wine for sacramental purposes. The exception found in the act of 1907-8 is:

"The provisions of this act shall not apply to * * * the use of wine for sacramental purposes in religious bodies."

The language in the act of 1910-11 (Laws 1910-11, c. 70) is:

"The provisions of this act shall not apply to that (liquors) for sacramental purposes."

In the case of Board of County Commissioners v. Alexander, 58 Okla. 128, 159 Pac. 311, it was held that when apparent that a strict interpretation of a particular statute, construed alone, would defeat the intention of the Legislature, as shown by other legislative enactments, which relate to the same subject, and which have been enacted in pursuance of, and according to general purposes in accomplishing a particular result, such construction should not be adopted. The section of the Constitution and the acts of the Legislature, so far as they deal with the prohibition question, were enacted in pursuance of and according to the general purpose of suppressing the evils incident to the liquor traffic, and to prevent the intemperate use of intoxicating liquors. In the case just referred to, in the opinion by the present Chief Justice, it was said:

"It is a cardinal rule in the construction of statutes that the intention of the Legislature, when ascertained, must govern, and that to ascertain the intent all the various provisions of legislative enactments upon the particular subject should be construed together and given effect as a whole. * * * When the language of a statute is dubious, the court, in construing it, will consider the reason and intent of the law to discover its scope and true meaning. * * * Subsequent legislative enactments may be considered as an aid in the interpretation of the prior legislation upon the same subject."

Another rule of construction, under which we arrive at the conclusion that prevention of the use of wine in the sacramental service was not intended, is the construction placed upon a statute by officials charged with the duty of enforcing the statute, either at or near the time of the enactment, and is a just medium for judicial interpretation. This rule was recognized by this court in the case of Hunter v. State ex rel. City of Shawnee, 49 Okla. 672, 154 Pac. 545, where Justice Hardy in delivering the opinion said:

"If there were any doubt of this being the correct construction of these statutes, unless the legislative intent to the contrary were clearly apparent, the fact that in the various counties officials charged with the enforcement thereof, from the date of the statute until the present, in the discharge of their duties under the revenue laws of the territory and state, have given such statute the same construction as we give, would be of great weight, and we would not disregard such construction without the most cogent and persuasive reasons."

In the case of Kelly, Sheriff, v. Multnomah County, 18 Ore. 356, 22 Pac. 1110, the Supreme Court of Oregon said:

"It is believed that the construction here given to these provisions is the same they received by those charged with the duty of their execution ever since their enactment, and this, of itself, would be sufficient to turn the scale if the question were doubtful. In all cases where those persons whose duty it is to execute a law have uniformly given it a particular construction, and that construction has been acquiesced in and acted upon for a long time, it is a contemporary exposition of the statutes which always commands the attention of the courts, and will be followed unless it clearly and manifestly appears to be wrong."

In 1892, by an act of Congress (27 Stat. L. 260, c. 234), it was made a crime to introduce, under any pretense, any ardent spirits, wine, or intoxicating liquors, of whatsoever kind, into the Indian Territory. In 1895, by an act of Congress (28 Stat. L. 693, c. 145), it was provided:

"That any person, whether an Indian or otherwise, who shall, in said territory, manufacture, sell, give away, or in any manner, or by any means, furnish to any one, either for himself, or another, any vinous, malt, or fermented liquors, or any other intoxicating drinks of any kind whatsoever, whether medicated or not, or who shall carry, or in any manner have carried into said territory any such liquors or drinks, shall be * * * punished," etc.

It must be admitted the terms of this act are sufficiently comprehensive to include every kind of fermented and intoxicating liquors. In the case of Ex parte Webb, 225 U. S. 663, 32 Sup. Ct. 769, 56 L. Ed. 1248, this act was held to be in full force and effect after statehood in that portion of the state formerly known as Indian Territory. Large sums of money have been appropriated by Congress, since statehood, for the purpose of enforcing this act in the eastern portion of the state. To that end special prosecutors and enforcement officers were appointed and many prosecutions had in the United States courts. Yet in no instance, so far as we know, has any officer charged with enforcement of that act undertaken to apply it to the use of wine for sacramental purposes.

We conclude that the use of wine for sacramental purposes in divine worship is no part of the evil of intemperance, the suppression of which is the object and purpose of the prohibition law of this state, and therefore the general term "intoxicating liquors," as used in section 46, art. 25, of the Constitution, does not include wine when used solely for that purpose.

The judgment will be reversed and the case remanded, with directions to grant the relief prayed for.

SHARP, C. J., and TURNER, HARDY, BRETT, RAINEY, MILEY, and TISINGER, JJ., concurring. KANE, J., not participating.