STATE ex rel. MARLAND, Gov., v. PHILLIPS PETROLEUM CO. et al.

No. 29200. Feb. 25, 1941.

Rehearing Denied Oct. 21, 1941.

Application for Leave to File Second Petition for Rehearing Denied Nov. 18, 1941.

*118 P. 2d 621.*

Mac Q. Williamson, Atty. Gen., and Fred Hansen and Randell S. Cobb, Assts. Atty. Gen., for plaintiff in error.

Snyder & Lybrand and Shirk, Paul, Earnheart & Shirk, all of Oklahoma City, L. A. Winans, of Duncan, Cantrell, Savage & McCloud, of Oklahoma City, Fred P. Branson, of Muskogee, Hal Houston and Pierce, McClelland, Kneeland & Bailey, all of Oklahoma City, D. E. Hodges, of Bartlesville, and Lee B. Thompson, Edward Howell, and Hayes, Richardson, Shartel & Gilliland, all of Oklahoma City, for defendants in error.

Don Emery and R. L. Foster, both of Bartlesville, and Harry D. Turner and E. G. DeParade, both of Oklahoma City, for cross-petitioners in error.

PER CURIAM. This is an action commenced by the State of Oklahoma, on the relation of E. W. Marland, then Governor, against the Phillips Petroleum Company, to recover the value of the accrued royalty from four oil and gas wells drilled on state-owned property, known as the "Parkway Tract."

The state-owned land consists of the parkway and streets in Lincoln boulevard south of 19th street and immediately west of blocks 10, 11, 18, and 19, Lincoln Terrace addition, in the city of Oklahoma City, Okla.

The State Board of Public Affairs, purporting to act under the provisions of article 4, chap. 20, S. L. 1935, advertised for bids for a lease covering said tract. The advertisement for bids stated that the land would be leased to the highest and best bidder for a royalty of one-fourth of the oil and gas produced, or its market value, and would be let on a bid form and leased on a lease form then on file with the secretary of the board. The lease form was referred to in the advertisement, made a part thereof, and contained the following provisions:

"Lessor agrees that this lease and the land covered thereby may be consolidated, jointly operated and developed with any other adjacent lease or leases covering any tract, or with any other lands, if required by the lessor and upon such terms as may be required by the lessor (and may be so consolidated, jointly operated and developed by lessee if permitted by lessor), such development and operation to be the same as if lessor and the owners of said other leases or tracts of land had entered into a joint lease covering the land so consolidated in the first instance."

The notice stated that bids would be received up to January 15, 1937, and was first published about December 23, 1936. The bid of Harper and Turner, a partnership, was accepted. A lease on the form mentioned was executed to Harper and Turner, dated February 3, 1937.

Shortly thereafter a number of owners of lots in the four blocks in Lincoln Terrace addition delivered a letter to the State Board of Affairs in which, after reciting a number of things which had been done in the course of development for oil and gas on state-owned lands surrounding the Capitol Building, they called attention to their claim that drilling for oil on the Parkway Tract would greatly damage and depreciate the value of their adjoining property, and certainty of drainage of oil and gas from under their premises.

This letter was in effect an application for consolidation of their property or leases thereon with the lease on the Parkway Tract on terms which they asserted they had been informed would be agreeable with the State Board of Affairs, including division of the one-fourth royalty on a basis of five-eighths thereof to the state and three-eighths to the lot owners in said four blocks, and concluded with a statement to the effect that unless consolidation could be speedily agreed upon they would resort to the courts in an effort to protect their rights.

On or about February 20, 1937, a number of owners of tracts in said blocks in Lincoln Terrace addition executed oil and gas leases covering their respective lots to Sunray Oil Company.

On February 20, 1937, the State Board of Public Affairs executed and delivered a letter addressed to the Sunray Oil Company, owners of tracts in blocks 10, 11, 18 and 19, in Lincoln Terrace addition, and the owner of the oil and gas lease on State Parkway property, in part as follows:

"You have requested that leases upon lots in Blocks 10, 11, 18 and 19, Lincoln Terrace Addition to Oklahoma City be permitted to be consolidated with the lease upon the State Parkway property.

"We have considered the application for consolidation; and in view of the larger drainage area which would be obtained for the State wells upon the Parkway by consolidation with the lots in Blocks 10, 11, 18 and 19, in Lincoln Terrace Addition to Oklahoma City, Oklahoma, we hereby agree that leases upon lots in said blocks may be consolidated with the State Parkway leases, upon the following terms:

"(1) The one-fourth royalty provided in the State Parkway lease shall be divided as follows:

"A. Five-eighths thereof shall be paid to the State Board of Public Affairs for the State of Oklahoma.

"B. Three-eighths thereof shall be set aside to the leased area of Blocks 10, 11, 18 and 19, in Lincoln Terrace Addition to Oklahoma City, Oklahoma, and paid to the owners of the lots therein agreeing to the consolidation in the proportion that the area of each lot bears to the total area leased in said Blocks.

"(2) It is understood that no wells shall be drilled for oil or gas upon any part of Blocks 10, 11, 18 and 19, Lincoln Terrace Addition to Oklahoma City, Oklahoma, but oil and gas shall be taken from underneath the same by drainage.

"Yours very truly,

"State Board of Public Affairs of the State of Oklahoma "By L. M. Nichols, Chairman, "A. W. Horton, Vice Chairman"

"Attest:
"Paul P. Colvert, Secretary,
"(Seal)"

Each of said leases executed by lot owners, after reciting the execution of the Parkway lease and its purported authority to consolidate, and further reciting that the "... State Board of Public Affairs of the State of Oklahoma has in writing consented to the consolidation of said State Parkway lease with leases on lots in blocks ten (10), eleven (11), eighteen (18) and nineteen (19) in Lin-

coln Terrace addition to Oklahoma City, Oklahoma, which consent is hereby referred to and made a part hereof as if set out in full herein: ..." contained the following provisions:

"... Now Therefore, lessor herein agrees that this lease and the land covered thereby may be consolidated, jointly operated and developed with the State Parkway lands above described, and with any other lots in said Blocks Ten (10), Eleven (11), Eighteen (18) and Nineteen (19) in Lincoln Terrace Addition to Oklahoma City, Oklahoma, leased to lessee herein, the same as if the State Board of Public Affairs of the State of Oklahoma and the owners of the lots executing leases to the lessee had entered into a joint lease covering the lands so consolidated in the first instance, it being agreed that the drilling of a well upon any part or portion of said consolidated lands shall constitute and be a full compliance with the terms and covenants of this lease, express or implied, relating to drilling operation hereunder, regardless of where offset wells may be hereafter drilled. ..."

It appears that the British American Company became the owner of a three-fourths interest in the Parkway lease and the Sunray became the owner of a one-fourth interest therein. Phillips Petroleum Company was the purchaser of the oil produced under said lease.

Later the Attorney General, in an opinion concerning proposed consolidation of other state land, in effect advised the board that consolidation of the Parkway tract with the lots in said four blocks was not authorized by the Legislature after the Parkway lease had been executed. By a later opinion he advised the board that no valid consolidation could be made.

As a result the State Board of Affairs declined to execute a division order based upon consolidation agreement as claimed by the lot owners.

Demand was made for payment of the value of the full one-fourth royalty interest to the state.

Phillips Petroleum Company, the purchaser, apparently took the position that

a valid consolidation agreement had been entered into and refused to accept a division order providing that the full one-fourth royalty be paid to the state.

Thereupon this action was commenced to collect the full amount.

The British American Company and the Sunray Company intervened. The owners of a number of lots in said blocks intervened, and after issues were joined, the cause was tried to the court, resulting in a judgment to the effect that the state was entitled to receive five-eighths of the one-fourth royalty interest reserved in the Parkway lease, and that the individual lot owners in said blocks 10, 11, 18 and 19 were entitled to receive three-eighths of the one-fourth royalty, with certain provisions for lot owners who had not executed leases on their lots.

Pending trial below it appears that the Phillips Petroleum Company, under a stipulation, paid to the state the accrued value of oil produced to that time based upon the five-eighths of one-fourth thereof, and has since been and is now paying that part of the value of the oil produced from said wells to the state.

Judgment was entered in favor of the state and against Phillips Petroleum Company for interest in the sum of $4,-127.10.

From the judgment and decree adverse to the claim of the state, plaintiff appeals. Phillips Petroleum Company by cross-petition in error appeals from the judgment against it for interest.

The appeal of the state involves the question of whether the proceeds of the three-eighths of the one-fourth royalty provided in the lease covering the Parkway tract, retained and held by the Phillips Petroleum Company, should be paid to the state or to the owners of the lots in blocks 10, 11, 18 and 19 in Lincoln Terrace addition to Oklahoma City.

The question presented requires examination of the acts of the Legislature authorizing the State Board of Public Affairs to lease the Parkway tract for oil and gas development. The state contends that article 4, chap. 20, S. L. 1935, is the law and the only law under which the Board of Affairs leased the Parkway tract, and that said act did not authorize the Board of Affairs to sell an oil and gas lease thereon in such a manner as to permit the agreed royalty to be divided with others.

Defendants in error contend that said act did give the Board of Affairs authority to advertise and sell the oil and gas lease with the consolidation provision therein and to consolidate or communize that lease with leases on other property and divide the royalty accordingly; that said act had been given departmental construction to that effect by the State Board of Public Affairs and the Attorney General, and that article 6, chap. 20, S. L. 1937, page 26, relates to the same subject matter and is in pari materia and not inconsistent with the 1935 act, and is supplemental thereto and gives express authority to consolidate.

Section 1 of art. 4, chap. 20, S. L. 1935, provides:

". . . The State Board of Public Affairs is hereby authorized and empowered to sell and execute oil and gas or mineral leases, . . . on any such property owned by the state, upon the basis of the retention of at least one-eighth (1/8), plus cash bonus, of the royalty in such leases. Such board shall advertise any such lease or leases or drilling contracts for sale for a period of at least twenty-one (21) days in a legal newspaper published and of general circulation in the county where said lands are located and shall award the same to the highest and best bidder; providing that all bidding shall be under sealed bids. The Board of Affairs is authorized to promulgate such additional rules and regulations as may be deemed necessary. All monies derived from the sale of such leases and royalties, or accruing from any other contract so made, shall be converted into the General Revenue Fund of the State. . . ."

The Parkway tract here involved is within that class of lands held in Lund v. Nichols et al., 177 Okla. 65, 57 P. 2d 592, as being under the control of the State Board of Public Affairs, and said

board was authorized by section 1, art. 4, chap. 20, S. L. 1935, to advertise and sell oil and gas leases thereon, under the terms, conditions, and regulations therein set forth. Authority to lease the Parkway tract is apparently conceded.

Bids were opened on January 15, 1937, and thereafter the bid of Harper and Turner was determined to be the highest and best bid.

But the lease was not executed until February 3, 1937. In the meantime, on January 22, 1937, article 6, chap. 20, S. L. 1937, being Senate Bill No. 49, 16th Legislature, was approved by the Governor with the emergency clause. That act deals specifically with the tract of land here mentioned and none other.

Section 1 of said act reads:

". . . The State Board of Public Affairs is hereby authorized and empowered to advertise, sell and execute an oil and gas lease or leases upon the following described state-owned lands constituting a portion of the State Capitol grounds, to wit: . . . In advertising, selling and executing such lease or leases, such board shall follow the provisions and requirements of art. 4, chap. 20, S. L. of Oklahoma, 1935; and such board may provide for the consolidation of such lease or leases with a lease or leases upon other lands under such terms as such board may determine. . . ."

Section 2 of said act repeals article 2, chap. 65, S. L. 1935, not material here, and then provides:

". . . and all other acts or parts of acts, in conflict herewith, are hereby expressly repealed; . . ."

Section 3 provides:

". . . The lands described in section one of this act shall be under the exclusive control and jurisdiction of the State of Oklahoma and the zoning and drilling regulations of any municipality of this state shall not apply thereto. . . ."

Plaintiff contends that the act of January 22, supra, has no connection whatever with the January 15, 1937, sale of said Parkway lease, and is not pertinent here.

As stated before, defendants in error contend that the act of January 22, 1937, supra, relates to the same subject matter covered by the 1935 act, is not inconsistent therewith, but supplements the authority given by the board under the 1935 act; and that the two acts are in pari materia and should be considered together in arriving at the intention of the Legislature.

The general rule is that statutes in pari materia are those which relate to the same person or thing or to the same classes of persons or things or which have a common purpose; that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject or having the same general purpose should be read in connection with it as together constituting one law. 59 C. J. 1042-46.

In Board of County Commissioners of Creek County v. Alexander, State Treas., 58 Okla. 128, 159 P. 311, it is held:

"It is a cardinal rule in the construction of statutes that the intention of the Legislature, when ascertained, must govern, and that to ascertain the intent all the various provisions of legislative enactment upon the particular subject should be construed together and given effect as a whole. . . . Subsequent legislative enactments may be considered as an aid in the interpretation of prior legislation upon the same subject. . . . When it is apparent that a strict interpretation of a particular statute, construed alone, would defeat the intention of the Legislature as shown by other legislative enactments, which relate to the same subject, and which have been enacted in pursuance of and according to a general purpose in accomplishing a particular result, such construction should not be adopted. . . ."

So we have this situation: Bids were advertised by the State Board of Affairs for the State Parkway tract under the provisions of the act of 1935. Bids were opened and the bid of Harper and Turner was accepted as being the highest and best bid. But before the lease was executed, the act of January 22, 1937, became effective. This act not only

gave specific authority to the Board of Affairs to advertise, sell, and execute an oil and gas lease or leases upon the Parkway tract, but it further provided that in advertising, selling, and executing such lease or leases, the board should follow the provisions and requirements of the act of 1935, but for the provisions of section 58, art. 5 of the Constitution of Oklahoma, Okla. St. Ann., as to encumbrances, etc., postponed operation and effect of the Act of 1937, supra, until 90 days after the adjournment of the Legislature. Riley v. Carico, 27 Okla. 33, 110 P. 738. Undoubtedly at the time of the contract of consolidation entered into by the State of Oklahoma and the lot owners of Lincoln Terrace, the Act of 1937, supra, could be viewed and should have been examined to determine the power and authority of the Board of Affairs as existing under the legislative Act of 1935, supra. It then gave the board specific authority to provide for the consolidation of such lease or leases with a lease or leases upon other lands under such terms as such board might determine.

It then provided that the lands described therein (the Parkway tract) should be under the exclusive jurisdiction of the State of Oklahoma, and that the zoning and drilling regulations of any municipality of the state should not apply thereto.

The act of 1935 and the act of January 22, 1937, certainly relate to the same subject and have the same general purpose.

Under the general rule stated in 59 Corpus Juris, supra, and the rule announced in Board of County Commissioners of Creek County v. Alexander, State Treasurer, supra, the two acts are in pari materia and should be read and construed together and given effect as a whole.

So far as the power to consolidate the lease with leases on other lands is concerned, the act of January 22, 1937, makes clear and plain the authority which was theretofore considered as implied in the act of 1935. Furthermore, it made plain and positive that the zoning and drilling regulations of the city of Oklahoma City were not to apply to said tract of land. Said act also gave the State Board of Affairs power to decide and fix the terms under which consolidation might be effected.

Reading the two acts together as affecting the authority of the board to enter into a consolidation agreement, that power existed at the time the lease on the Parkway property was executed and at the date of the so-called consolidation agreement thereunder the State Board had the right and power to determine or fix the terms of consolidation. The terms so fixed provided that no well or wells were to be drilled on blocks 10, 11, 18, and 19.

It then becomes unnecessary to discuss the applicability of the zoning and drilling regulations of Oklahoma City.

These regulations could never apply unless and until application is made to drill a well on some part of the land embraced with the said blocks.

Plaintiff contends that if it be conceded that authority for consolidation existed, the consolidation proposed and submitted by the board called for consolidation with leases on all and not merely a portion of the lots in blocks 10, 11, 18, and 19.

This contention is not sustained for the reason that the terms of consolidation provided that the one-fourth royalty provided for in the lease should be divided five-eighths thereof to the state and three-eighths shall be set aside to the lease owners of blocks 10, 11, 18, and 19, and said owners of lots therein agreeing to consolidation, in the proportion that the area of each lot bears to the total leased area in said blocks. This clearly shows that consolidation was intended only with leases on lots whose owners agreed to the consolidation. At that time owners of 31 of the 37 lots had executed leases. How many had at that time agreed to consolidation does not appear. The way was left open for others to lease and agree to the consolidation. At the date of the trial all the owners, with the possible exception of one, had

leased and consented to the consolidation or expressed a willingness so to do.

A serious question is presented under the contention of plaintiff that plat restrictions in the certificate of dedication of Lincoln Terrace addition prevent lots here mentioned from being consolidated or communized for oil and gas development.

In this connection plaintiff cites Southwest Petroleum Co. et al. v. Logan and Southwest Petroleum Co. et al v. Swindall et al., 180 Okla. 477, 71 P. 2d 759, wherein it is held:

"A valid restriction that 'all lots in this plat are restricted to residences only' prevents the use of such property for the drilling of oil and gas wells."

The actions there involved were to obtain an injunction to prevent drilling operations on certain lots in certain blocks of said addition. This court specifically declined to discuss the question of whether the leases held by the Southwest Petroleum Company were void.

Plaintiff cites Cash v. Beveridge, 183 Okla. 310, 82 P. 2d 665, as the most important decision bearing upon the question here presented.

Therein we affirmed the trial court in refusing to require communizing of block 21, Lincoln Terrace addition, with block 3, Second State Capitol addition, not within Lincoln Terrace. But in the opinion it is stated:

"We base our affirmance, not upon the bar of plat restrictions, but by reason of the exercise of a discretion as to area to be attached."

The plaintiff in that action was the owner of lot 4 in block 21, Lincoln Terrace. Counsel for plaintiff herein calls attention to certain language in the body of the opinion wherein it is said:

"Plaintiff does not contend that he could enter into a lease, or in any way subject his land to the ordinary rights of a lessee. At no time since the property was platted and dedicated could he have done so."

Plaintiff asserts that by this holding it is made clear that no lot owner involved in this case has ever had authority to execute a valid oil and gas lease on his lot or to in any way subject his land to the ordinary rights of a lessee.

In that case the right of the owner of the lot in block 21, Lincoln Terrace addition, to execute a valid oil and gas lease thereon was not involved. It does not appear that he had executed an oil and gas lease. It was not necessary then to decide whether a valid lease could have been executed.

There was no lease and no application to drill on any lot in said block 21. So what was there said with reference to the power to execute a valid lease is obiter dictum.

That a lot owner in Lincoln Terrace could not subject his land to the ordinary rights of an oil and gas lease to the extent of drilling an oil and gas well thereon was decided in Southwest Petroleum Co. v. Logan and Southwest Petroleum Co. v. Swindall, supra.

We adhere to the rule there announced. But we are not now willing to say that no valid oil and gas lease could be executed by any of the owners of lots in Lincoln Terrace addition under any circumstances.

Plaintiff asserts that the "lease or leases upon other lands," as used in the act of January 22, 1937, supra, meant only leases which would permit the lessees to enter upon the leased premises and to drill for oil thereon.

The only land available for consolidation with the Parkway lease was the lots in said blocks 10, 11, 18, and 19. The Legislature must have had that land in view when the law of January 22, 1937, was enacted.

This is clearly indicated, so far as the State Senate is concerned, by a Senate Resolution adopted by the State Senate on February 19, 1937, whereby the Senate approved the plan to communize the Parkway tract with the territory located directly east of the Parkway tract in Lincoln Terrace addition, with a division

of the one-fourth royalty on the basis of three-eighths to the lot owners and five-eighths to the state, provided it be done under the supervision of the board of adjustment of Oklahoma City.

This was not a joint resolution; was not approved by the House of Representatives nor the Governor, and therefore did not have the force and effect of law, but it does throw some light on the intent of the Legislature, or at least the Senate, in adopting the act of January 22, 1937, which bill originated in the Senate.

Plaintiff contends that there was no valid consolidation or communization for the reason that the provisions relating to consolidation set forth in the form of lease under which bids were called for and the form of lease actually used in leasing the Parkway tract were not followed.

The contentions made, as we understand the position of the Attorney General, are:

"(1) That because the Parkway lease provided that the 'Lessor agrees that this lease and the land covered thereby may be consolidated, jointly operated and developed with any other adjacent tract or with any other lands ... upon such terms as may be required by the lessor ... such development and operation to be the same as if a joint lease had been entered into in the first instance,' and,

"(2) Because the Parkway lease provided: 'In the event of such consolidation, in computing the square foot acreage, any portion of the lands herein described which may be used for street, passageway or highways, shall be considered within the square foot acreage covered by this lease, and computation shall be made accordingly, and any portion of any tract consolidated herewith, which may be so used for public purposes shall be excluded from the acreage of such tracts and computation shall be made accordingly.' "

And because the alleged consolidation agreement provides for a division of the one-fourth royalty, five-eighths to the state and three-eighths to the owners of lots in said blocks agreeing to the consolidation, and without reference to the proportional square foot area of the respective tracts or parcels of land, the consolidation agreement conflicts with the provisions of the lease and is therefore void.

These contentions are untenable. We have herein pointed out that the zoning and drilling regulations of the city could only be operative when an application was presented for a permit to drill a well on lands within the U-7 zone. After the act of January 22, 1937, became effective the Parkway tract was without the jurisdiction and control of the city under its zoning and drilling regulations, if it had ever been subject thereto.

No permit was necessary and the city board of adjustment had no authority whatever over said tract. The act of January 22, 1937, supplemented the act of 1935, and authorized consolidation or communization with a lease or leases on other lands under such terms as the State Board of Public Affairs might determine. The very purpose of consolidation or communization of oil and gas leases covering different lots, tracts, or parcels of land is to enable the owners or lessees to develop the property for oil without requiring a well to be drilled on each separate lot, parcel, or tract; and to determine for themselves how many wells should be drilled and where same should be located, so as to produce the oil and gas with less expense, and to divide the proceeds equitably and in such proportion as they deem advisable.

The Board of Affairs was authorized to determine the terms under which consolidation should be effected, and to provide as one of the terms that no well should be drilled on the Lincoln Terrace lots. This would have been true had there been no plat restrictions prohibiting drilling on said lots. The fact that such restrictions did exist did not deprive the board of power to require that the wells be drilled on the Parkway tract. Good and sufficient reasons may well have existed for such requirements without regard to plat restrictions.

The provision for dividing the one-fourth royalty, five-eighths to the state

and three-eighths to the lot owners of Lincoln Terrace consenting to consolidation, was another express authority given by the act of January 22, 1937, supplementing whatever authority the board had under the 1935 act. Furthermore, there is nothing in the record to show that the square foot area theory was not in substance complied with. Casual examination of the exhibits, without accurate computation of the square foot area of the two tracts, discloses that the area of the lots on Lincoln Terrace, which had been leased, not including any streets, comprises substantially three-eighths and the Parkway tract, including streets, comprises substantially five-eighths of the total area involved.

The next contention made by the plaintiff is that there was no valid consideration for the consolidation agreement. It is asserted: (1) That by said agreement the state did not obtain freedom from competing wells on lots in said blocks because plat restrictions prevented such drilling; (2) that it did not obtain increased drainage, since drilling thereon was not only prohibited by plat restrictions but by the express terms of the leases executed by the respective owners; and (3) that the state did not obtain immunity from liability for damages suffered by the owners of said lots from drilling operations on the Parkway tract, because the state is immune both from suit and from such liability.

Defendants in error contend that there was a good consideration for the consolidation agreement in that the owners of the lots in said blocks waived and surrendered: (1) The right to drill for oil and gas on said blocks; (2) the right to institute suit to prohibit drilling on the State Parkway property; (3) the right to institute suits for damages, except for negligence, by reason of the drilling of wells on the Parkway property; and (4) the right to obtain waiver of restrictions in Lincoln Terrace addition from all property owners in said addition in order to drill on said blocks.

If the surrender of all or any of these alleged rights constituted a good consideration, then the claim of the plaintiff of no consideration must fail.

We must consider this question under circumstances and conditions existing at the time rather than under circumstances and conditions which later developed.

Section 9440, O. S. 1931, 15 Okla. Stat. Ann. § 106, defines a good consideration as:

"Any benefit conferred, or agreed to be conferred upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise."

Section 9441, O. S. 1931, 15 Okla. Stat. Ann. § 107, further defines a good consideration as:

"An existing legal obligation resting upon the promisor, or a moral obligation, originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

From the time bids for the lease on the Parkway tract were advertised down to the date of the alleged consummation of the consolidation agreement, there was a heated contest over the right of owners of property in Lincoln Terrace addition to drill for oil and gas thereon. Many of the owners, some 60 per cent. or more, according to the evidence, including some of the owners of lots in said blocks, were insisting on the right to drill notwithstanding plat restrictions. Other owners contended that no such drilling should be permitted, because the resultant depreciation in the value of their property, the inconvenience, noise and noxious vapors, etc., necessarily incident to oil field development, would far outweigh any benefits, and because plat restrictions prohibited such use of the property.

The Logan and Swindall Cases were pending.

The district court in the Logan Case, supra, on January 11, 1937, held that

plat restrictions prohibited drilling on the Lincoln Terrace addition. But that case as well as the Swindall Case was appealed to this court and final decision of that question was not made until September 14, 1937. So at the time there was a claim being asserted in apparently good faith of the right to drill on Lincoln Terrace addition property. But the state was not a party to that controversy. The state had never, so far as the record shows, opposed the right of the owners or any one of the owners of lots in that area to drill for oil and gas thereon.

Defendants in error present the rule stated in Fenner et al. v. Sparks, 170 Okla. 556, 39 P. 2d 27, to the effect that a doubtful or disputed claim honestly and in good faith asserted, arising from a state of facts upon which a cause of action can be predicated, with reasonable belief of the party asserting it, may constitute a good consideration for a compromise and settlement, although it may subsequently develop that such claim was unfounded. This rule is not applicable.

But it would seem that the consolidation agreement did give rise to a moral if not a legal obligation on the part of the state originating in some benefit, or at least a supposed benefit, to the state in the consummation of the consolidation agreement. Attention is here called to a part of the language used in the letter of the State Board of Affairs of February 20, 1937, addressed to the Sunray Oil Company and owners of tracts in blocks 10, 11, 18, and 19, and the owner of the oil and gas lease on the State Parkway property. It reads in part:

"You have requested that leases upon lots in Blocks 10, 11, 18 and 19, Lincoln Terrace Addition to Oklahoma City be permitted to be consolidated with the lease upon the State Parkway property.

"We have considered the application for consolidation; and in view of the larger drainage area which would be obtained for the State wells upon the Parkway by consolidation with the lots in Blocks 10, 11, 18 and 19, in Lincoln Terrace Addition to Oklahoma City, Oklahoma, we hereby agree that leases upon lots in said blocks may be consolidated with the State Parkway lease, upon the following terms":

Then follows paragraph 1 of the terms which provides for division of the royalty as above set forth. Then follows paragraph 2 of the terms, as follows:

"(2) It is understood that no wells shall be drilled for oil or gas upon any part of Blocks 10, 11, 18 and 19, Lincoln Terrace Addition to Oklahoma City, Oklahoma, but oil and gas shall be taken from underneath the same by drainage."

The benefit considered as flowing to the state was "the larger drainage" area which would be obtained by the state. The obligation it undertook to assume in return for such benefit was to permit the consolidation, and one of the conditions was that no wells should be drilled for oil or gas on any part of blocks 10, 11, 18, and 19.

Accordingly the owners of some 31 lots executed oil and gas leases, which expressly provided that no wells were to be drilled thereon. By this arrangement the state was assured of the increased drainage area, regardless of how the question of the right to drill on Lincoln Terrace addition should ultimately be decided.

The State Board of Affairs was in effect contracting against a possible future holding of the court that the plat restriction did not prohibit drilling on Lincoln Terrace addition, including the four blocks mentioned. It was afterwards held that plat restrictions prohibited such drilling, but in view of the possibility existing at the time that the ultimate decision might have been the other way, it would seem that there was at least a moral obligation on the state to carry out its part of the agreement, sufficient to constitute a good consideration.

As to the surrender of the right to institute suit to prohibit drilling on the Parkway tract, the plaintiff urges that the state being immune from suit, the lot owners had nothing of that nature to surrender or waive. This may be true as to any suit against the state itself, but the state's lessees were not immune from such a suit. Action could have been

brought against them, which if successful would have been effective to prevent such drilling. So to that extent the lot owners did surrender or waive some right which they might have had to test the right of the state to permit its lessees to drill.

Refraining from bringing a suit may furnish a consideration. 13 C. J. 344.

The rule as to whether the claim must be an actual valid claim, or only a claim of doubtful validity, is not uniform. The majority rule is stated in 13 C. J. 346, as follows:

"The principle followed in perhaps the majority of cases is that one has a right to sue where his claim is reasonably doubtful, and that forbearance to enforce a claim which might reasonably be thought doubtful is a sufficient consideration, on the ground 'that reality of the claim which is given up must be measured, not by the state of the law as it is ultimately discovered to be, but by the state of the knowledge of the person who at the time has to judge and made the concessions.' "

Cases are cited from many jurisdictions in support of that rule. A more liberal rule supported by cases cited from a number of jurisdictions stated in 13 C. J. 347, is:

"A third view is that one has a right to sue when he believes that he has a good cause of action, that it is enough if plaintiff can show that at defendant's request he forebore to prosecute a claim which he believed to be well founded, and that it is no answer to show that the claim was not well founded or was not even reasonably doubtful."

Under the facts and circumstances existing at the time, we hold that there was good consideration in support of the consolidation agreement.

There was no error in upholding the consolidation or communization agreement.

By its cross-appeal Phillips Petroleum Company assigns as error the action of the trial court in rendering judgment in favor of the state for interest on the sum representing five-eighths of the one-fourth royalty accrued from and after June 2, 1937.

Although the state claimed the entire one-fourth royalty, its ownership of three-eighths of said one-fourth was disputed. The trial court was under the impression that interest was due the state on the sum representing the five-eighths aforesaid from the time the same became payable, and rendered judgment accordingly.

The general rule is that in order to stop the running of interest, tender of the principal debt must be made at the proper time and place. 33 C. J. 241, § 146. If interest is to be avoided in such case, the debtor must tender the entire amount due. Tender of a lesser sum will not relieve him of interest on the amount tendered. Krauss v. Potts, 53 Okla. 379, 156 P. 1162. The tender must be unconditional and in an amount sufficient to cover the demand. Muldoon v. Hostuttler, 96 Okla. 288, 222 P. 513.

In Krauss v. Potts, above, the court held as follows:

"The tender of a less sum than is actually due will not prevent the running of interest thereafter on the whole principal, as though tender had been made."

And in the Muldoon Case we held:

"In order to successfully plead a tender of payment in an action upon a money demand, the tender must be unconditional, and must be of such amount as to cover the demand."

The uncontradicted evidence shows that Phillips Petroleum Company was ready and willing at all times to pay the state the full amount representing five-eighths of the one-fourth royalty accrued. It suggested a stipulation between all the parties to clarify the claims of ownership in the royalty; it submitted a division order, but the state failed or refused to take any part in these matters; at no time did it manifest an interest in an attempt to agree upon a payment of the five-eighths of the one-fourth. Nor was there any indication of a desire or willingness on its part to accept a tender of the five-eighths had such tender actually been made. The state's demand was the full one-fourth royalty at all times. There is no evidence

640

that it ever relinquished that demand or indicated a willingness to alter the same.

In those circumstances it was impossible for the company to make an unconditional tender of the demand. The state's demand was all the royalty. A tender of a lesser sum would have been a conditional tender. There was no legal duty on the part of the company to tender all the demand. And an actual tender of the five-eighths could have been accepted only conditionally on the part of the state. That is evident in the light of the claims of the other parties. And it is clear that the state at no time would have accepted a tender of the five-eighths except on conditions special to itself. It was not the obligation of the company to make a tender with conditions suitable to the state, especially in the absence of a demand specifying the conditions.

It has been said that a formal tender is not dispensed with by a mere assertion, without more, of a claim in excess of the actual amount due, for a tender of the proper sum might be accepted. Curtis v. Wilson, 181 Okla. 23, 72 P. 2d 383; 62 C. J. 660. But that rule is ordinarily applied only where there is a dispute between the debtor and creditor as to the amount due. It cannot apply in cases like the instant one where third parties are claiming a specified portion of the amount demanded, and it is also made to appear conclusively that a tender of the portion not claimed by the third parties will be accepted only on condition that such acceptance shall not prejudice the creditor's claim to the balance of the amount demanded. The debtor is under no obligation to make such a conditional tender, and in fact is without power to make such a tender in the absence of consent of the third party claimants. It is not the debtor's duty to bring the claimants to an agreement concerning their legal rights.

The judgment against the Phillips Petroleum Company for the interest is therefore reversed.

All the Justices concur in the affirmance of the judgment on the appealed cause, except WELCH, C. J., and OS-BORN and ARNOLD, JJ., who dissent.

All the Justices concur in the reversal of the judgment on cross-appeal, except WELCH, C. J., and RILEY and ARNOLD, JJ., who dissent.

RILEY, J. (dissenting). I dissent to the applicability of the proposition of law stated in paragraph 6 of the syllabus.

As the majority view it, the debtor is entitled to avoid payment of interest because, as it appears to the majority, the creditor, the state, would accept payment for that part of the royalty oil over which there was no controversy only on condition that its claim to the balance would not be prejudiced by acceptance of such payment. My difficulty in so concluding is that it does not appear to me that the state refused to accept payment for the five-eighths of the one-fourth royalty oil only on condition stated. I cannot treat as true the evidence of the witnesses for the Phillips Petroleum Company and reject as untrue the testimony of the Attorney General. I think all are bound by the law rule so as to prevent this court from weighing the evidence and arriving at a finding different from that of the trial court.

This controverted question of fact was before the trial court on conflicting evidence. The trial court held in favor of the state. I would sustain that finding.

On the other hand, if this case is to be treated as one in accounting, and therefore in the nature of an equitable proceeding, the majority view upon this issue should be predicated on the weight of the conflicting evidence.

ARNOLD, J. (dissenting). I cannot agree with the views expressed by my associates in the majority opinion. This case involves the distribution of several hundred thousand dollars representing accrued and accruing royalties on state-owned lands to private individuals, and is, therefore, a public question and I feel that I should set forth my views.

The record discloses that the State Board of Public Affairs determined, as it had a right to do, to sell an oil and gas lease upon the state-owned Parkway lands south of the Capitol Build-

ing. Except for an intervening street or boulevard this land is contiguous to blocks 10, 11, 18 and 19, Lincoln Terrace addition to Oklahoma City, Okla. Notice was published as required by law advising the public that the State Board of Public Affairs would accept bids up to 10 a. m., on January 15, 1937, for an oil and gas lease on said specifically described tract of land. The Board of Public Affairs did accept bids for said lease as set forth by the notice and determined on said date that Harper and Turner, a copartnership, was the highest and best bidder; it bid one-fourth royalty and a cash bonus of $301,004; said bonus was paid and appropriated by the state, and there is no question herein as to the proper distribution of said cash bonus.

Senate Bill No. 49, the same being article 6, ch. 20 of the 1937 Session Laws, was being considered on said date by the Legislature. It was finally passed by the Legislature on January 20, 1937, and sent to the Governor, who approved same January 22, 1937. It provided for notice as prescribed in article 4, ch. 20 of the Session Laws of 1935. The lease to Harper and Turner was executed by the Board of Public Affairs on February 3, 1937. On February 20, 1937, a letter was written by the Board of Public Affairs, in response to a letter from certain property owners in the designated blocks of Lincoln Terrace requesting the Board of Public Affairs to consolidate their lots with the Parkway lease or tract, to such property owners, the Sunray Oil Company and owners of the Parkway lease. It is contended that this letter is the consolidating factor in this case. No doubt, in contemplation of the final passage and approval of the 1937 act, notice was given of the contemplated sale of the oil and gas lease in question on state-owned lands. Nobody now seriously contends, nor does the majority opinion as supplemented hold, that the 1937 act became effective at the date of its approval by the Governor, January 22, 1937, although an emergency clause was attached thereto. The majority opinion, in fact, correctly concedes that the effective date of the 1937 act, because of the constitutional inhibition contained in section 58, art. 5, was delayed until August 10, 1937, inasmuch as the 1937 act created an encumbrance on state-owned lands and would not therefore become effective until 90 days after adjournment of the Legislature that passed it. Since the 1937 act was not effective on either January 15, 22, or February 3, 1937 (the date of execution of lease) said lease could not have been and was not sold under and by virtue of the terms and authority of the 1937 act. Contrary to the intention and anticipation of the Board of Public Affairs, said property owners and the purchaser of said oil and gas lease, the sale was made, if at all, under the authority of the 1935 act. The 1935 act empowered the Board of Public Affairs *to sell oil and gas leases* on state-owned lands, but made *no* provision for consolidation thereof with any other lease or tract. Excepting the repealing, emergency and approving clauses thereof, it is as follows:

"The State Board of Public Affairs is hereby authorized and empowered to sell and execute oil and gas or mineral leases, or such State Board of Public Affairs may enter into drilling contracts with persons or corporations for the drilling of oil and gas wells on any such property owned by the state, upon the basis of the retention of at least one-eighth (1/8), plus cash bonus, of the royalty in such leases. Such Board shall advertise any such lease or leases or drilling contracts for sale for a period of at least twenty-one (21) days in a legal newspaper published and of general circulation in the county where said lands are located and shall award the same to the highest and best bidder; providing that all bidding shall be under sealed bids. The Board of Public Affairs is authorized to promulgate such additional rules and regulations as may be deemed necessary. All monies derived from the sale of such leases and royalties, or accruing from any other contract so made, shall be converted into the General Revenue Fund of the State."

All the parties to this action, to wit, the State of Oklahoma, the lessee, and the property owners of Lincoln Terrace

contend for and assert the validity of the lease. It was advertised, bids accepted, and lease executed by the Board of Public Affairs as prescribed by the 1935 act; therefore, on and after February 3, 1937, it constituted a valid and subsisting oil and gas lease on the Parkway lands owned by the State of Oklahoma. The notice of sale provided that: "The tract herein being advertised as hereinafter described shall be let on a bid form and leased on a form of lease now on file with the Secretary of the State Board of Public Affairs. . . ." This lease form, which was the one thereafter executed, contains the following language with reference to consolidation:

"Lessor agrees that this lease and the land covered thereby may be consolidated, jointly operated and developed with any other adjacent lease or leases covering any tract, or with any other lands *if required by the lessor and upon such terms as may be required by the lessor* (and may be so consolidated, jointly operated and developed by lessee *if permitted by lessor*), such development and operation to be the same as if lessor and the owners of said other leases or tracts of land had entered into a joint lease covering the lands so consolidated in the first instance."

Casual reading of this language shows that this is a reservation to the state of the right thereafter to consolidate said lease with pre-existing leases on other lands if it thereafter saw fit and determined to do so according to proper legislative authority.

Note this reservation is entirely in favor of the state, and, of course, put in the lease for the purpose of notifying the purchaser that a consolidation may thereafter be determined and effected by the state so that if this were done the lessee could not complain thereof. The state reserved the right thereafter to effect a consolidation, and the lessee, if such were done, could not complain so long as the consolidation was accomplished according to the terms of the reservation and did not prejudice the lessee by an increase of its duty under the lease which it purchased. It was the duty of the lessee to drill, and is still the duty of the lessee to operate this lease in the manner prescribed by the lease, and the alleged consolidation has in nowise changed the terms of the lease or placed a greater duty upon the lessee. The lessee pays no more royalty and is obliged to drill no more wells or to operate the lease in a different manner than if consolidation had never been attempted. Insofar as the State of Oklahoma is concerned, the lessee still enjoys all the rights and privileges and is subject to no greater duty than that provided by the lease before consolidation was ever attempted. By no stretch of the imagination can it be said that this provision of the lease amounts to consolidation.

It is, therefore, apparent that this controversy is entirely between the State of Oklahoma and certain property owners of Lincoln Terrace. The unauthorized action of the Board of Public Affairs, in its futile attempt to consolidate the lease on state-owned property, has no effect upon the validity of the lease that had already been bought and paid for by the lessee. The state's present action does not contest the validity of the lease, and, therefore, the state has no controversy with the lessee. The lessee is in no position then to complain that the state has not elected to declare the whole deal off. The state admits and asserts the validity of the lease, but contests the right or authority of the Board of Public Affairs to make a private deal thereafter consolidating said lease with privately owned property. Estoppel will not lie against the sovereign state regarding the authority of its officers, nor, under these circumstances, can the lessee force the state to elect what course of action it shall pursue against individuals with whom it made a purported, private agreement. If the State of Oklahoma were insisting on an arrangement with third parties, the enforcement of which would increase the duty of the lessee or materially vary its responsibility, then the theory of election of remedies might apply. That is not the case, however, here.

The terms and conditions of the lease were definitely fixed therein and the obligations, rights and privileges of the

State of Oklahoma, as lessor, and Harper and Turner, a copartnership, as lessee, were definite. By the terms of said lease the State of Oklahoma should and did receive the cash bonus bid and was thereafter entitled to one-fourth of all the oil and gas produced by the development and operation of said lease.

The entire transaction between the State of Oklahoma, *the owner and lessor,* and Harper and Turner, *the lessee,* was fully consummated on February 3, 1937. Any deal thereafter to be consummated between the State of Oklahoma and any outsiders to this lease agreement would have to be under and by virtue of specific statutory authority. Lingo-Leeper Lumber Co. v. Carter, 161 Okla. 5, 17 P. 2d 365; 59 Corpus Juris, 171, 173.

The deal or consolidation that the property owners contend was effected between the State of Oklahoma and them, if consummated at all, is embodied in a letter written by the Board of Public Affairs, dated February 20, 1937. This conclusion is inescapable; in fact, conceded by all the parties. The pertinent part thereof is: "We hereby agree that leases upon lots in said blocks *may be consolidated* with the State Parkway lease, upon the following terms: . . ." As between the lot owners and the state nothing transpired thereafter *relative to consolidation.*

Leases were obtained by the Sunray Oil Company from 31 of the 37 lot owners in said blocks with a provision therein for the consolidation thereof with the state-owned Parkway tract, together with the provision for the division of the royalties that would accrue from such tract. The Board of Public Affairs took no action (formal or otherwise) thereafter and did nothing to effectuate the consolidation as contemplated in its letter of February 3, 1937. Apparently the reason nothing further was done to complete such an important transaction was the fact that the Attorney General was finally asked for advice and advised the State Board of Public Affairs that such a deal would be illegal for the reason that there was no authority of law therefor.

"Public officials have and can exercise only such powers as are conferred on them by law, and the state is not bound by contracts made in its behalf by its officers or agents without previous authority conferred by statute or Constitution."

Lingo-Leeper Lumber Co. v. Carter, supra, pronounces this well-settled and universally followed rule as to authority of public officials in this state. So, therefore, it being conceded that the 1937 act did not become effective until August 10, 1937, the *authority* to consummate said transaction, if such authority existed, must be found in the 1935 act. As pointed out above, there is not a word in the 1935 act specifically concerning consolidation or communization. The majority opinion holds that by reason of the provision of the 1935 act, "the Board of Public Affairs is authorized to promulgate additional rules and regulations as may be deemed necessary," gave the Board of Public Affairs the authority to consolidate. If this contention is incorrect, then, as conceded by all, there would be no authority vested in the Board of Public Affairs to effect the consolidation attempted. So we come to a consideration of this provision quoted above. This sentence is a part of the paragraph of section 1 of said act and immediately succeeds the sentence prescribing the amount of royalty that must be received, the character of notice that must be given, and how it shall be advertised, that the award shall be made to the highest and best bidder, and that the bids shall be sealed. This power to make additional rules and regulations refers to such incidental things as it might deem necessary. This shows conclusively that this power to make rules and regulations means only such rules and regulations as may be deemed necessary by the Board to effectuate the sale of the oil and gas lease. (Note the sale had been made many days prior to the date the letter was written.) Certainly the Legislature never intended that the proceeds of an oil and gas lease sold according to such specific instructions could thereafter be sold or traded to a private individual by a private contract without advertisement, without

receiving sealed bids and without making the trade or sale to the highest bidder. This is exactly what the Legislature intended to prevent by prescribing the minimum requirements set out in the 1935 act. The Board of Public Affairs could, however, by reason of this rule making power, determine other requirements to be met by the purchaser. This provision does not authorize the making of rules and regulations that would amount to legislation, that is, authorize the Board of Public Affairs to do more than sell oil and gas leases. The Legislature could not authorize an administrative board, such as the Board of Public Affairs, to legislate. The 1937 Legislature evidently was cognizant of this situation. It knew there was no authority to consolidate by private arrangement, and it knew, as we know, that it was not the intention of the 1935 Legislature to provide, even by implication, for a consolidation after the sale of an oil and gas lease on state-owned land with privately owned property, thereby giving up a large portion of a vast sum of money accruing to the state by reason of production of oil and gas on its land. However, it determined that the additional power to consolidate should be granted to the Board of Public Affairs, and knowing that the power did not theretofore exist, it passed the 1937 act. This act applies to only one tract of state-owned land, the Parkway, and the only additional authority provided therein was the power to consolidate a lease thereon with other leases. It would be foolish for the Legislature to pass an entire act to provide authority that it knew theretofore existed. Recognizing the absolute non-existence of such power it enacted the 1937 act, which did not become operative until August 10, 1937. The attempted consolidation by the Board of Public Affairs on February 20, 1937, was without authority of law and therefore a nullity.

However, this may be, the 1936 act amending the 1935 act, which became effective January 6, 1937, repealed by implication the so-called "rule-making" power of the Board of Public Affairs provided in the 1935 act. So, when the letter, allegedly exercising this rule-making power, was written February 20, 1937, the so-called "rule-making" power did not exist.

There are other reasons why the attempted consolidation in this case was not effective. The state contends there was no legal consideration sufficient to support the transaction even if there were authority in law therefor, and the authority were exercised in conformity with the prescribed method of procedure. In determining whether there is sufficient legal consideration to support a contract you must consider carefully the status or representative capacity of the parties thereto and the value of the thing given up as compared to the severity of the detriment suffered.

We know from the record in this case that the assigned portion of the royalty accrued to date is in excess of $350,000; that on the basis of the monthly accrual thereof, it can be reasonably anticipated that it will ultimately approximate in excess of one-half million dollars.

This lease was considered by the purchasers so valuable that the consideration paid therefor was a cash bonus of $301,004, or about $30,000 per acre, in addition to a one-fourth royalty instead of the usual one-eighth royalty.

The conclusion is inescapable that the interest assigned had a known value of at least one-half million dollars at the time the deal was made with the lot owners.

The lot owners claim that they gave up their right to sue for damages except for negligence; that their land would be drained; that the inclusion of their lots in the leased area would increase the drainage area of the wells on the state land; that they gave up their right to sue to enjoin operations; that they gave up their right to drill.

The contention that the lot owners gave up their right to sue for damages except for negligence is untenable. Same

constitutes no legal consideration for the obvious reason that the sovereign state could not be sued for such damages. They, therefore, gave up no right to sue the state and no consideration flowed to the state in this respect; if their deal with the state should fall, there would then be no consideration whatsoever to support their leases to the oil company for said leases provided for a division of the royalties that would accrue on the Parkway owned by the state; they would then have their original right to sue the developing company for damages other than for negligence.

We are thoroughly committed to the rule of capture as applied to oil and gas. There is no ownership in oil and gas uncaptured and in place. Everybody ordinarily has the right to explore on their own land and reduce oil and gas to possession. Until this is done there is no ownership therein. The State of Oklahoma, therefore, is not draining the oil and gas that belongs to, or that the owners in Lincoln Terrace have a property interest in. Once oil and gas from wells on state-owned land is reduced to possession, under a valid oil and gas lease, as the one herein considered, the royalty accruing therefrom belongs to the State of Oklahoma and the individual owners of Lincoln Terrace have no property rights therein unless they have a valid enforceable contract that gives them an ownership interest in said oil and gas after it is captured and reduced to possession.

So their contention that their land would be drained is likewise untenable. As pointed out above, we adhere to the rule of capture and the developing company would not even be liable for drainage by reason of production of oil from state-owned land under a valid lease in the absence of negligence or contractual relationship with the lot owners. In any event the state would not be liable for damages in connection with the drainage.

Their contention, that their giving up their right to sue to enjoin operations is a supporting consideration, is unsound for the reason that the state is immune from such suit; it had the right to drill on said tract and produce oil and gas therefrom; it could do through its lessee that which it itself could do and as long as the lessee had a valid binding agreement authorizing it to drill, the lessee could not be enjoined. To permit the lot owners to enjoin the lessee under these circumstances would permit the lot owners to do indirectly what they could not do directly, that is, enjoin the state.

We next come to a consideration of the other and last contention made by the lot owners of Lincoln Terrace in connection with the question of consideration supporting their arrangement with the state. They contend that they gave up their right to drill and thereby produce oil and gas, and that the giving up of this right increased the drainage area of the state wells. There was a plat restriction against drilling operations in Lincoln Terrace effective at the time of the alleged arrangement with the state. Said plat restriction had been passed upon and held effective by three trial courts theretofore. Said plat restriction had been considered by the district court of Oklahoma county on two occasions, and in both instances held effective to prevent drilling for oil and gas in any part of Lincoln Terrace. Both of said cases were appealed to the Supreme Court of the State of Oklahoma, and the judgments of the trial court were affirmed; the affirmance of the second case, however, was after the attempted consolidation in this case. Said plat restriction was also passed upon by the Federal District Court for the Western District of Oklahoma, where it was also determined that said restriction prohibited drilling in said addition. However, the owners of lots in Lincoln Terrace still had the right to go into a court of equity and there present their contention that conditions had changed and the existing conditions then were such as to render the enforcement of said restriction unconscionable. Under such a showing a court of equity would strike down said restriction and refuse to enforce it. It is also true that by mutual consent of all the lot owners in

Lincoln Terrace addition, said plat restriction might be waived and rendered ineffective. In such event drilling operations could be carried on. That situation might arise or be brought about at some subsequent date.

However indefinite and insignificant these rights may appear to have been, and, however improbable the success of said lot owners might be in these respects, the giving up of these rights is some indefinite detriment and the same has some intrinsic value. Is it sufficient, however, to support a transaction involving approximately one-half million dollars? It is grossly and flagrantly inadequate. It is doubtful if same would be sufficient to support the same transaction between private individuals. A different rule, however, maintains where you have private individuals on the one hand and public officers, handling public funds or property, on the other hand. Where public officers, such as the members of the Board of Public Affairs, as trustees of the people's property, purport to transfer, assign, sell or trade same, there must be a reasonably adequate consideration paid.

You have this situation here: This indefinite, highly improbable future right to drill in Lincoln Terrace addition was exchanged to the state by 31 out of approximately 400 lot owners therein for approximately one-half million dollars.

The majority opinion describes the consideration as "some benefit, or at least a supposed benefit." So under the majority opinion for the giving up of "some benefit, or at least a supposed benefit," these individual owners of lots in blocks contiguous to the state-owned Parkway land, to the exclusion of the other owners of 355 lots, received or will receive approximately one-half million dollars. Note in this connection also that only 31 of the 37 lot owners in said contiguous blocks have signed any lease, and, therefore, the six who have not given up their right to drill may in the future drill on their lots, thereby causing a failure of the only consideration that the state received. Note too, that the

state wells on the Parkway tract are offset to the north, west, and south, and two of the four wells are offset to the east; most of the offsets to these wells are on state-owned lands. The state, therefore, is providing most of the drainage that the lot owners contend they are furnishing. I cannot agree that the stamp of approval of the Supreme Court of the State of Oklahoma shall be placed upon such a transaction.

In transactions with the officials of the government, or branch thereof, the rule of caveat emptor applies and private individuals, corporations or companies in such transactions with the state deal at their peril. The public interest is greater than that of any individual, corporation or company. "County property should not be sold for less than its known value," 15 Corpus Juris, 538, and purchases from public officials, with the authority to sell, should not be sustained "without the receiving in return some consideration of reasonably equivalent value." Haesloop v. City Council of Charleston, 123 S. C. 272, 115 S. E. 596. Certainly public officers are not authorized to sell public property that they hold in trust for all the people for a grossly inadequate consideration. All the cases cited by the lot owners of Lincoln Terrace involved herein as regards *consideration* have to do with transactions between private individuals. Private individuals may, if they desire, give their property away and any legal consideration is sufficient to support a sale between private individuals of privately owned property. The Constitution of the State of Oklahoma prohibits a gift by the state. There is no such inhibition as between individuals. If officers of the state cannot make an outright gift of state property, likewise, and for the same reason, they cannot purportedly sell it for a wholly inadequate consideration. The holding of the South Carolina Supreme Court that such a consideration must be "of reasonably equivalent value" is a complete embodiment of the spirit of the constitutional inhibition as to gift. Since this lawsuit involves publicly owned property, the

public interest therein is always present. It, therefore, makes no difference whether the Board of Public Affairs acted in a governmental or proprietary capacity; the effect of this transaction is to give away a vast majority of the royalty accruing on state land to private lot owners under and by virtue of an attempted consolidation.

As regards the matter of the sale of property owned by the state, it makes no difference whether the transaction is or might be in connection with a proprietary function or a governmental one, if there was no authority to make the sale or the consideration was inadequate. By reason of the constitutional inhibition public officials of the state cannot make gifts, in whole or in part; so, therefore, we should adhere to the rule that a consideration to support a sale, assignment or transfer of public property must be reasonably adequate. The constitutional inhibition makes no distinction between property owned and possessed, assigned or transferred in a governmental capacity from that owned, transferred or assigned in a proprietary capacity. The framers of the Constitution intended that the peoples' property should not be given away in whole or in part. A sale based on a consideration not reasonably equivalent to the value of the thing sold would amount to a gift in part, and in this case an almost entire gift, in violation of the spirit and, I think, the letter of the constitutional inhibition as to gift.

If such consideration is sufficient, then a thing of insignificant value can be exchanged to the state, as here, for approximately one-half million dollars, though we all agree that no property of the state, regardless of the value thereof, may be given away. (To illustrate: No official of the state—not even the Governor nor the Legislature—could give a secondhand Ford car worth $50 to the members of the Board of Public Affairs for use while supervising the operation of state leases, yet the majority opinion holds that the State Board of Public Affairs can trade royalty worth over one-half million dollars for a simple, highly improbable futurity).

The 1935 act provided that "The State Board of Public Affairs is hereby *authorized* and empowered to sell and to *execute* oil and gas or mineral leases . . . on such property owned by the State"; the 1937 act provided that "The State Board of Public Affairs is hereby *authorized* and *empowered* to *advertise, sell* and *execute* an oil and gas lease or leases upon the following described state-owned lands." As to the *general* power granted, the two acts are exactly alike, the only difference being that the 1937 act was restricted in its application to the Parkway tract therein described, while the 1935 act applied to all state-owned lands. The Board of Public Affairs, the lot owners, the lessee and the Sunray Oil Company, and the 1937 Legislature knew that the 1935 Legislature totally failed to provide authority to consolidate, so the 1937 Legislature added the only provision of the 1937 act not contained in the 1935 act, that is, the power to provide for consolidation. The 1937 Legislature surely never dreamed that such a valuable thing as consolidation with the benefits of increased drainage would be disposed of without advertisement and an opportunity on the part of the buying public to bid thereon. This record is replete with testimony that the matter of "drainage" is an important and valuable thing in the oil industry; the lessee testified that the anticipated drainage from Lincoln Terrace by reason of the plat restriction and the consolidation provision of the lease, accounted for the unusually large cash bonus and royalty bid by it. There is not a word in either act which even hints that such a valuable thing as consolidation could be accomplished by private arrangement. The 1937 Legislature, therefore, intended that consolidation should actually be provided in the lease, and this fact advertised along with the lease so the buying public would be informed thereof and the state would receive competitive bids therefor. The exact wording of the 1937 act relative to consolidation is as follows: "Such Board may provide for the consolidation of such lease or leases with a lease or leases upon other lands under such terms as such Board

may determine." This act contemplated the existence of other leases upon other lands at the time of its passage; it contemplated that the lease which might be sold thereon would provide for consolidation with other then existing lease or leases on other lands, and that such provided consolidation would be advertised in connection with the lease and the State of Oklahoma receive the consideration that the consolidation would invite.

The 1937 act provided a way to accomplish consolidation; the state in making the sale of said oil and gas lease reserved to itself the right to consolidate thereafter. This right would, of course, have to be exercised after the 1937 act became effective, and would have to be exercised in the manner prescribed. The record discloses that the Attorney General advised the Board it did not have the authority to consolidate under the maintaining circumstances *and* the *state was trying to repudiate the deal before* the *1937 act went into effect August 10, 1937*. There was never anything done by the state, *except* try to get out of the deal, after the Board of Public Affairs wrote its letter on February 20, 1937. The state did not do one thing after the effective date of the 1937 act that would even intimate a favorable attitude toward the deal as regards the lot owners; quite to the contrary, the Attorney General advised that such a deal was illegal, made demand for all the royalty money, refused a division order prepared in accordance with the consolidation letter, and finally filed suit for all the royalty money.

The purpose of requiring that a lease on state lands be advertised is to advise the buying public of what is about to be sold so that the highest price obtainable may be gotten. In order, therefore, to insure that the state would receive the proper consideration for drainage, that would naturally be an incident to consolidation, the Legislature intended that the consolidation should be effected before the lease was sold. Nobody would pay for this thing called "drainage" unless it was provided for in the lease which they were buying; unless the

notice of the sale set forth the consolidation the public would not be advised about it.

Assuming, only for the sake of argument, that the power to make rules and regulations carries with it the implied power to consolidate under the 1935 act, still the consolidation would have to be determined and provided in the lease before the sale. All that has been said of the 1937 act in this respect is equally true of the 1935 act, indulging the violent presumption that the 1935 Legislature intended by the provision authorizing the Board of Public Affairs to make additional rules and regulations to give authority to said Board to consolidate on terms privately arrived at after the sale of the lease.

The lot owners and lessees make a rather strange contention regarding the application of estoppel in this case. While conceding generally that the state, by reason of its sovereignty, cannot be estopped, they contend that the selling of oil and gas leases and the operation thereof, even though the lease in question is on Capitol grounds held and maintained for governmental purposes, amounts to the exercise of power in a proprietary capacity. On the other hand, the state contends that "estoppel does not operate against the state," as was said in State ex rel. King v. McCurdy, 171 Okla. 445, 43 P. 2d 124, in any manner involving the authority of public officials of the state to act. It contends that the members of the Board of Public Affairs being public officers and trustees of the people had no authority to do the thing attempted. As I have hereinbefore shown, there was no authority to consolidate under the 1935 act or any other effective act of the Legislature or our Constitution. We said in Airy et al. v. Thompson et al., 154 Okla. 1, 6 P. 2d 445, that:

" 'No estoppel can be granted by the acts of such agents or officers in excess of their statutory or constitutional powers' 15 C. J. 541; In re Town of Afton, 43 Okla. 720, 144 P. 184."

I know of no case wherein we have ever varied from such rule. I know of

no case outside of this jurisdiction, nor have we been cited any authority making application of a different rule, where the question of authority of public officials to act was in question. All cases cited by the defendants with reference to the application of the rule of estoppel as against the state are cases wherein the question of authority to act in the first instance was not involved. So, therefore, the sovereign state can never be estopped to question the authority of its officials to act in the premises.